USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1331 ROSEMARY PYE, REGIONAL DIRECTOR, ETC., Petitioner, Appellee, v. TEAMSTERS LOCAL UNION NO. 122, Respondent, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge] ___________________ _________________________ Before Selya and Cyr, Circuit Judges, ______________ and Schwarzer,* Senior District Judge. _____________________ _________________________ Stephen R. Domesick for appellant ___________________ Corinna L. Metcalf, Deputy Assistant General Counsel, with ___________________ whom Frederick Feinstein, General Counsel, Ellen A. Farrell, ___________________ _________________ Assistant General Counsel, and Barry J. Kearney, Acting Assistant ________________ General Counsel, were on brief, for appellee. _________________________ August 8, 1995 _________________________ _______________ *Of the Northern District of California, sitting by designation. SELYA, Circuit Judge. This appeal features an SELYA, Circuit Judge. ______________ interlocutory injunction issued on the authority of section 10(l) of the National Labor Relations Act (NLRA), barring a labor union's innovative practice of conducting "group shop-ins" at secondary businesses (retail liquor outlets) as an outgrowth of its grievance with a primary employer (a beer distributor).1 After carefully considering the parties' positions in light of the pertinent authorities, we affirm the district court's order in all respects. I. THE FACTS AND THE PROCEEDINGS BELOW I. THE FACTS AND THE PROCEEDINGS BELOW The facts are set out in the district court's opinion, see Pye v. Teamsters Local Union No. 122, 875 F. Supp. 921, 923- ___ ___ ______________________________ 24 (D. Mass. 1995), and it would serve no useful purpose to rehearse them here. We content ourselves with a decurtate summary, presented in a manner that recognizes the statutory edge  ____________________ 1Section 10(l) provides in relevant part: Whenever it is charged that any person has engaged in an unfair labor practice [as defined in other sections of the NLRA], the preliminary investigation of such charge shall be made forthwith . . . . If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any [appropriate] United States district court . . . for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. 29 U.S.C. 160(l) (1988). The same statute authorizes the district court to grant such injunctive relief "as it deems just and proper . . . ." Id. ___ 2 enjoyed by petitioner-appellee, the Regional Director of the National Labor Relations Board (NLRB or Board), in connection with the resolution of disputed factual issues and the inferences that may be drawn therefrom. In November of 1994, respondent-appellant Teamsters Local Union No. 122 (the Union), then embroiled in a labor dispute with August A. Busch & Co. of Massachusetts, Inc. (Busch), organized three group shopping trips. During each outing, Union members descended, in droves and in concert, upon a designated retail establishment and engaged in multiple rounds of penny-ante purchasing, buying small, inexpensive items such as packs of chewing gum or bags of potato chips and paying for them (more often than not) with bills of large denomination. The sequelae were predictable: overcrowded parking lots, congested aisles, long checkout lines, and an exodus of regular customers. Although some of the group shoppers adorned themselves with Union symbols, the record contains virtually no proof of objectively expressive activity. More particularly, we can find no evidence suggesting that the Union, through group shopping, made any discernible attempt to communicate a defined message to the public.2 The three shop-ins, each involving a different retailer engaged in commerce, occurred at different locations in  ____________________ 2During one of the excursions some Union adherents remained outside the store, holding banners aloft. The injunction issued by the lower court does not affect that activity, and we consider it irrelevant for the purpose of determining the issues sub ___ judice. ______ 3 Massachusetts. The first incident transpired on November 17, when a band of approximately 70 Union members invaded the premises of Kappy's Liquors. The group shopping (which respondent prefers to call "affinity group shopping" or "associational shopping") persisted for some 45 minutes. The record reflects that at least one customer, apparently discouraged by the crush of Union members, left without transacting any business. The second shop-in occurred on November 23 at Wollaston Wine. This event also lasted about 45 minutes. Approximately 125 Union members participated. The third incident took place on November 25 at the liquor department of Price Costco, a discount house. It involved 50 or so Union members. The record does not pinpoint its duration. All three episodes began late in the afternoon (a prime time in the package store trade), and the latter two incidents occurred on the days before and after the Thanksgiving holiday (days that customarily produce substantial sales for liquor retailers). The record reveals that on at least two of the occasions store managers complained to a Union official who was on the premises, deploring the disruptive effects of the practice on their business. On the third occasion, the store owner apparently took his concerns directly to Busch. Busch displayed little affinity for the Union's newly contrived stratagem. It complained to the Regional Director who, in turn, initiated an administrative adjudicatory process to examine whether the group shopping constituted an unfair labor 4 practice prohibited by NLRA 8(b)(4)(ii)(B), 29 U.S.C.  158(b)(4)(ii)(B) (1988). The Regional Director theorized that, because the Union's actual labor dispute was with the primary employer, Busch, section 8(b)(4)(ii)(B) expressly prohibited it from trying to impair the relationships of secondary businesses (the retail stores) with Busch. Resisting this line of reasoning and denying any wrongdoing, the Union asseverated that these shop-ins were efforts to publicize its grievance with Busch, and were thus beyond the statute's proscriptive reach. The Union also asseverated that, in the end, the group shopping actually benefitted the retailers by generating hundreds of dollars in sales. The Regional Director refused to buy the Union's wares. On December 1, she invoked section 10(l) and petitioned for temporary injunctive relief in the federal district court, asserting that she had reasonable cause to believe that the associational shopping amounted to an illegal secondary boycott because its real purpose was to force the retailers to cease purchasing beverages from Busch. The district court, perceiving no need for an evidentiary hearing,3 found for the Regional  ____________________ 3Section 10(l) directs that affected parties "shall be given an opportunity to appear by counsel and present any relevant testimony." Here, however, the district court found that the papers were sufficient. See Pye, 875 F. Supp. at 928 ("Based ___ ___ simply on the affidavits of the Union representative and the admissions made by the Union . . ., all of the relevant facts are admitted."). Although the Union's briefs appear critical of this ruling, the Union has not appealed from it, and we decline to address it further. See Ryan v. Royal Ins. Co. of Am., 916 F.2d ___ ____ _____________________ 731, 734 (1st Cir. 1990) ("It is settled in this circuit that issues adverted to on appeal in a perfunctory manner, 5 Director. See Pye, 875 F. Supp. at 925-28. In due course, the ___ ___ court entered a decree that constitutes the actual injunction. Its key provisions are set out in the margin.4 This appeal ensued. II. THE LAW AND ITS APPLICATION II. THE LAW AND ITS APPLICATION The so-called labor injunction has been among the most controversial landmarks dotting the historical landscape of American labor law. See generally Felix Frankfurter & Nathan ___ _________ Greene, The Labor Injunction (1930); Clarence E. Bonnet, The _____________________ ___ Origin of the Labor Injunction, 5 S. Cal. L. Rev. 105 (1931); _______________________________ Eileen Silverstein, Collective Action, Property Rights, and Law _____________________________________________  ____________________ unaccompanied by some developed argumentation, are deemed to have been abandoned."). 4The decree prohibits the Union, and various categories of individuals associated with it, from: (a) organizing and conducting mass demonstrations, including affinity group shopping, store occupations, occupying parking lots, picketing or other mass activity, where an object thereof is to force or require Kappy's Liquors, Wollaston Wine, Price Costco or any other person to cease using, selling, handling, transporting or otherwise dealing in the products of or to cease doing business with August A. Busch & Co. of Massachusetts, Inc. (b) in any manner or by any means, threatening, coercing or restraining Kappy's Liquors, Wollaston Wine, Price Costco or any other person engaged in commerce or in an industry affecting commerce where an object thereof is to force or require Kappy,s Liquors, Wollaston Wine, Price Costco or any other person to cease using, selling, handling, transporting or otherwise dealing in the products of or to cease doing business with August A. Busch & Co. of Massachusetts, Inc. 6 Reform: The Story of the Labor Injunction, 11 Hofstra Lab. L.J. ___________________________________________ 97 (1993). The section 10(l) injunction is a special species of the labor injunction,5 designed to halt, inter alia, secondary _____ ____ activity that the Regional Director believes is in violation of NLRA 8(b)(4)(ii)(B) until the NLRB can consider the charges and reach a decision on the merits. The special nature of the section 10(l) injunction informs our analysis of the case. A. Standards of Review. A. Standards of Review. ___________________ The standards of review applicable to appeals from district court decisions arising under section 10(l), whether granting or denying the requested relief, are extremely deferential. We review the lower court's factual findings for clear error; we review its rulings of law de novo; and we review its ultimate conclusion, authorizing or withholding the requested relief, for abuse of discretion. See Hoeber v. Local ___ ______ _____ 30, United Slate, Tile & Composition Roofers, Etc., 939 F.2d 118, __________________________________________________ 123 (3d Cir. 1991); Union de Tronquistas de P.R., Local 901 v. ________________________________________ Arlook, 586 F.2d 872, 876 (1st Cir. 1978); see also Asseo v. ______ ___ ____ _____ Centro Medico del Turabo, Inc., 900 F.2d 445, 450 (1st Cir. 1990) ______________________________ (explicating identical standards under a corollary relief provision, NLRA 10(j), 29 U.S.C. 160(j)); Asseo v. Pan Am. _____ _______ Grain Co., 805 F.2d 23, 25 (1st Cir. 1986) (same); see generally _________ ___ _________ George Schatzki, Some Observations About the Standards Applied to ________________________________________________  ____________________ 5Inasmuch as section 10(l) is aimed almost exclusively at unions, it represents a marked departure from the anti-injunction ethos embodied in the Norris-LaGuardia Act, Pub. L. No. 72-65, 47 Stat. 70 (1932) (codified as amended and repealed in part at 29 U.S.C. 101-115 (1988)). 7 Labor Injunction Litigation Under Sections 10(j) and 10(l) of the _________________________________________________________________ National Labor Relations Act, 59 Ind. L.J. 565, 575-76 (1983) _____________________________ (noting these standards of review and the striking pattern of appellate deference under section 10(l)). Our level of deference is heightened because we are perched on the second tier of review vis-a-vis the Regional _________ Director's assertion of reasonable cause. The district court occupies the first tier, and just as that court must itself defer in significant measure to the evaluative judgments of the Regional Director, see, e.g., Union de Tronquistas, 586 F.2d at ___ ____ ____________________ 876, so, too, must we defer to the district court.6 Thus, in this doubly sheltered enclave, the judicial task is generally confined to weeding out wholly arbitrary or thoroughly insupportable petitions for relief. See Squillacote v. Graphic ___ ___________ _______ Arts Int'l Union, 540 F.2d 853, 859 (7th Cir. 1976). ________________ Of course, an important reason undergirding the  ____________________ 6This layered deference district court to Regional Director and appellate court to district court has parallels elsewhere in the law. For example, we have encountered a virtually identical design when reviewing district court assessments of consent decrees under certain environmental statutes. See, e.g., United States v. DiBiase, 45 F.3d 541, 543- ___ ____ _____________ _______ 44 (1st Cir. 1995); United States v. Cannons Eng'g Corp., 899 _____________ ____________________ F.2d 79, 84 (1st Cir. 1990). In such circumstances, we have been impelled to note that "by the time [such] consent decrees reach this court, they are encased in a double layer of swaddling," DiBiase, 45 F.3d at 544 (internal quotation marks omitted), _______ reflecting not only the district court's justifiable mandate to defer to administrative expertise, but also the appellate court's mandate to defer to the trial court's factfinding expertise and its informed discretion. In turn, this "doubly required deference district court to agency and appellate court to district court places a heavy burden on those who purpose to upset a trial judge's approval of a consent decree." Cannons, _______ 899 F.2d at 84. The burden is equally heavy here. 8 deferential standard of judicial review in section 10(l) cases is that neither the district court nor the court of appeals is adjudicating the merits, as such, to determine whether an unfair labor practice occurred. To the contrary, the courts' role at this stage is merely to supply a stopgap, that is, to palliate a likely violation detected by the Regional Director "pending the final adjudication of the Board with respect to such matter." 29 U.S.C. 160(l). Consequently, a decision in a section 10(l) proceeding is circumscribed in both time and scope, and any relief that may be granted is effective only while the related unfair labor practice charge is pending before the NLRB.7 See ___ Sears, Roebuck & Co. v. Carpet, Linoleum, Soft Tile & Resilient _____________________ ________________________________________ Floor Covering Layers, 397 U.S. 655, 658-59 (1970) (per curiam); _____________________ Walsh v. International Longshoremen's Ass'n, 630 F.2d 864, 868 _____ ___________________________________ (1st Cir. 1980). Given the design of the statute, the agency expertise involved, and the two-tiered structure of review, a party appealing from an order granting or refusing a temporary injunction pursuant to section 10(l) confronts the sobering prospect that most battles over the appropriateness of such  ____________________ 7Still another reason to accord a significant degree of deference to the claims of the Regional Director is the strength of the congressional mandate. See Union de Tronquistas, 586 F.2d ___ ____________________ at 876. Under the law, once the Regional Director has reasonable cause to believe that a Union's activity falls within the proscription of section 10(l), she "shall . . . petition . . . _____ for appropriate injunctive relief . . . ." 29 U.S.C. 160(l) (emphasis supplied). This is in stark contrast to section 10(j), which grants discretion to pursue injunctions against employers under specified circumstances. See Miller v. California Pac. ___ ______ ________________ Medical Ctr., 19 F.3d 449, 456 (9th Cir. 1994) (en banc) _____________ (recognizing the dichotomy); see generally Schatzki, supra, at ___ _________ _____ 568-71 (comparing and contrasting the provisions). 9 redress will be won or lost long before appellate review takes hold. B. Standard of Analysis. B. Standard of Analysis. ____________________ Congruent with these deferential standards of review, the analytic path to be traversed in a section 10(l) case is narrower than that typically travelled in the course of reviewing the grant or denial of preliminary injunctive relief. Indeed, "in a section 10(l) case the judicial inquiry is only, or at least primarily, whether there is reasonable cause to believe a section 10(l) offense has been committed." Maram v. Universidad _____ ___________ Interamericana de P.R., Inc., 722 F.2d 953, 958 (1st Cir. 1983). ____________________________ Other factors that ordinarily inform district court actions in respect to temporary injunctions are, at most, of secondary interest. See id. (concluding that "the special importance that ___ ___ Congress attaches to section 10(l) offenses indicates . . . a strong presumption of irreparable harm, with the balance in favor of the charging party, and that the public interest favors the injunction"). Hence, the method of analysis that governs appellate review of the propriety and scope of a section 10(l) injunction is best described as follows: First, the court must determine whether the Regional Director has reasonable cause to believe that the elements of an unfair labor practice are present. In this regard, the Director need only show the existence of credible evidence, even if disputed, together with reasonable inferences, which support [her] conclusions. . . . Second, the court must conclude that the legal theories relied upon by the Director are not without 10 substance. Finally, it must find that temporary injunctive relief is "just and proper" in terms of effectuating the purposes of the Act. Union de Tronquistas, 586 F.2d at 876 (citations omitted). ____________________ Having stated the bareboned test, we next flesh out its three constituent parts. 1. Reasonable Cause. The centerpiece of the required 1. Reasonable Cause. ________________ analysis is the supportability vel non of the Regional Director's ___ ___ determination that there is reasonable cause to believe that an unfair labor practice has been, or is being, committed. The case law reveals two principles, in particular, that demarcate the meaning and the margins of this requirement. First, the Regional Director's evidentiary burden, whether measured quantitatively or qualitatively, is modest. Although courts phrase this principle in different ways, sometimes speaking in terms of the Regional Director's burden of proof, see, e.g., Hirsch v. Building & Constr. Trades Council, ___ ____ ______ ___________________________________ 530 F.2d 298, 302 (3d Cir. 1976) (characterizing burden as "relatively insubstantial"), sometimes speaking in terms of the quantum of proof, see, e.g., Gottfried v. Sheet Metal Workers' ___ ____ _________ _____________________ Int'l Ass'n, Etc., 927 F.2d 926, 927 (6th Cir. 1991) (requiring _________________ only that the Regional Director bring forth "some evidence" in support of her petition), and sometimes speaking in terms of the probative value of evidence as opposed to its raw quantity, see, ___ e.g., Union de Tronquistas, 586 F.2d at 876 (requiring that the ____ _____________________ Regional Director "show the existence of credible evidence, . . . together with reasonable inferences," to support her 11 conclusions), the thrust of the decided cases is uniform: the Regional Director need not prove that the respondent has in fact violated the NLRA, but, rather, she need only make a minimal evidentiary showing of good reason to believe that the essential elements of an unfair labor practice are in view. The second principle that is germane to the reasonable cause inquiry is that genuinely disputed issues of material fact should be resolved at this early stage in favor of the Regional Director's exposition. See Maram, 722 F.2d at 958; Union de ___ _____ ________ Tronquistas, 586 F.2d at 876; Kaynard v. Mego Corp., 633 F.2d ___________ _______ __________ 1026, 1031 (2d Cir. 1980). Put another way, in proceedings under section 10(l) the Regional Director must be given the benefit of every legitimate fact-based doubt. Thus, a reviewing court "need not concern itself with resolving conflicting evidence if facts exist which could support the [Regional Director's] theory of liability." Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d _________ ___________________________ 26, 29 (6th Cir. 1988). 2. Legal Theory. The next segment of the tripartite 2. Legal Theory. _____________ analysis implicates the legal theory on which the Regional Director relies. The requirement is straightforward: the Regional Director's theory need not be irreproachable; it suffices if it "is not without merit." Union de Tronquistas, 586 ____________________ F.2d at 877. In other words, the Regional Director need not persuade the court then and there of her theory's ultimate validity, but she must show that the theory is presentable. See ___ Hirsch, 530 F.2d at 302 (explaining that the legal theory upon ______ 12 which the Regional Director proceeds must be "substantial and not frivolous"); see also Hoeber, 939 F.2d at 123-24 (quoting Hirsch ___ ____ ______ ______ with approval); see generally 8 Theodore Kheel, Labor Law  ___ _________ __________ 38.01[1], at 38-9 (1995). 3. Just and Proper. Finally, injunctive relief 3. Just and Proper. _________________ granted pursuant to section 10(l) must, by the terms of the statute itself, be "just and proper." Both the purpose and the contours of this imperative are relatively well-developed. "The purpose of the 10(l) injunction is to preserve the status quo in order that the ultimate decision of the Board would not be negated or rendered moot by intervening events." Compton v. _______ National Maritime Union of Am., 533 F.2d 1270, 1276 (1st Cir. ________________________________ 1976). Thus, temporary injunctive relief, if otherwise warranted, passes the "just and proper" test as long as it comprises a reasonable means of ensuring the efficacy of the Board's final order, or preserving the status quo, or permitting administrative proceedings to go forward without undue hindrance, or preventing unjustified interruption of the free flow of commerce, or forestalling the repetition of unfair labor practices. See, e.g., Hoeber, 939 F.2d at 122; Gottfried, 927 ___ ____ ______ _________ F.2d at 927; Asseo, 900 F.2d at 455; Union de Tronquistas, 586 _____ _____________________ F.2d at 878. In this sense, the purpose of the section 10(l) injunction is simply a narrower, more specific expression of the purpose underlying preliminary injunctions in general. See, ___ e.g., CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d ____ ____________________ ________________________ 13 618, 620 (1st Cir. 1995) ("The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the [ultimate trier of the issues], upon full adjudication of the case's merits, more effectively to remedy discerned wrongs."). Since a section 10(l) injunction "may enjoin only those unlawful labor practices specified in the [NLRA]," Hendrix v. _______ International Union of Operating Eng'rs, Local 571, 592 F.2d 437, __________________________________________________ 445 (8th Cir. 1979), the form of the injunction must dovetail with the statutory goals. However, less is often better than more, and the relief granted should be narrowly tailored to that which is reasonably necessary to stop mischief, prevent additional harm, and ensure effective final relief. See ___ Gottfried, 927 F.2d at 928; Potter v. Houston Gulf Coast Bldg. _________ ______ _________________________ Trades Council, 482 F.2d 837, 841 (5th Cir. 1973). ______________ C. Applying the Standards. C. Applying the Standards. ______________________ Applying these standards of review and analysis, we conclude that the instant decree passes muster. 1. Reasonable Cause. The statutory proscription that 1. Reasonable Cause. ________________ triggered section 10(l) in this case, namely, section 8(b)(4)(ii)(B), makes it "an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person . . . ." The question at this step of the analysis, 14 therefore, reduces to the supportability of the district court's finding that the Regional Director had reasonable cause to believe (1) that the activity of group shopping might somehow threaten, coerce, or restrain a retail liquor outlet, and (2) that an object of the group shopping was to force or require such secondary businesses to sever relations with Busch. We conclude that this finding is not clearly erroneous. First and foremost, it is reasonable to regard the practice of group shopping as potentially coercive. The character of the conduct including the use of all or virtually all of a store's parking lot, the occupation of much of the interior shopping area, the forbidding presence of a throng of people acting in unison, and the fostering of long checkout lines through repeated purchases of small items with large bills  tends by its very nature to disrupt normal commercial activity and, thus, to place economic pressure on a retail establishment to appease the Union by, say, cutting back on dealings with the primary employer.8 The Union counters that, even so, the  ____________________ 8The Union's insistence that the shop-ins actually generated sales for the retailers is a red herring empirically erroneous, conceptually incomplete, and legally irrelevant. For one thing, sales limited to snacks and individual drinks during a prime selling period scarcely seem economically beneficial when compared to the retailer's opportunity costs, that is, the displaced sale of liquor, wine, and other more profitable items. See Pye, 875 F. Supp. at 926 ("In the regular course of events, ___ ___ one would expect eighty customers to spend more than four dollars each."). Similarly, the Union's rodomontade utterly disregards the potential long-term economic consequences of the shop-ins, such as the easily envisionable loss of intimidated or frustrated customers. For another thing, it is the secondary business, not the Union, that should determine what is or is not in the former's best economic interest. Here, the record strongly 15 evidence falls short. Insofar as this argument presumes that moderately obstructive conduct by a union is not alone sufficient either to trigger section 8(b)(4)(ii)(B) or to justify a section 10(l) injunction, we accept the presumption. See National ___ ________ Maritime Union of Am. v. NLRB, 367 F.2d 171, 176 (8th Cir. 1966), _____________________ ____ cert. denied, 386 U.S. 959 (1967). Because section 8(b)(4) _____ ______ ultimately proscribes objects rather than merely the means adopted to accomplish them, the record must contain enough evidence to permit a finding that the Union actually possessed the statutorily proscribed object of forcing secondary establishments to cease doing business with the primary employer. We think that the Regional Director satisfied this requirement here. To be sure, there is no smoking gun, no direct ______ evidence of an avowed intention to influence the retailers' commercial behavior. But a "union's `object' may be inferred from its acts," New York Mailers' Union No. 6 v. NLRB, 316 F.2d ______________________________ ____ 371, 372 (D.C. Cir. 1963), and particularized evidence of subjective intent is not essential for proof of a violation. See ___ NLRB v. Erie Resistor Corp., 373 U.S. 221, 227 (1963); NRLB v. ____ ____________________ ____ Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 688-89 ________________________________________ (1951); Soft Drink Workers Union Local 812 v. NLRB, 657 F.2d ____________________________________ ____ 1252, 1261-62 (D.C. Cir. 1980); Pickens-Bond Constr. Co. v. __________________________ United Bhd. of Carpenters & Joiners of Am., Local 690, 586 F.2d ______________________________________________________  ____________________ suggests that the retailers themselves did not welcome the Union's custom. Finally, whether or not economic harm actually occurs as a result of a union's secondary activity is, in the circumstances of this case, largely beside the point. 16 1234, 1241 (8th Cir. 1978); see also International Longshoremen's ___ ____ ____________________________ Ass'n v. Allied Int'l, Inc., 456 U.S. 212, 224 (1982) (confirming _____ __________________ that a union "must take responsibility for the `foreseeable consequences' of its conduct") (quoting NLRB v. Retail Store ____ _____________ Employees Union, Local 1001, 447 U.S. 607, 614 n.9 (1980)). It ___________________________ follows that, if an unwholesome object can logically be inferred from the nature of the conduct, evaluated in light of the practical realities of a given situation, then direct evidence of the object need not be produced. See, e.g., Local 357, Int'l ___ ____ _________________ Bhd. of Teamsters, Etc. v. NLRB, 365 U.S. 667, 675 (1961). _______________________ ____ Here, the facts permitted the Regional Director rationally to infer an unlawful object on the Union's part. The Union's conduct was undertaken in such a way, and at such times, as to maximize its obstructiveness. And, moreover, this effect can easily be viewed as primary and deliberate, not incidental and accidental. Hence, the Regional Director could reasonably have believed that the principal object of the shop-ins was to force the secondary businesses to stop trading with the primary employer. As the district court perspicaciously observed, the group shop-ins can reasonably be interpreted as having been designed to send a dual message to the retailers: first, "that the Union has the ability to interfere with the working of their business at any time," and second, that the retailers ought "not to get involved with Busch" in the ongoing labor dispute by picking up merchandise directly from Busch's warehouse. Pye, 875 ___ F. Supp. at 926. 17 The Union has a fallback position. Citing both Edward ______ J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades __________________ __________________________________________ Council, 485 U.S. 568 (1988), and the First Amendment, the Union _______ hawks its right, specifically preserved by section 8(b)(4), to publicize its grievance with a primary employer.9 Building on this theme, the Union claims that the injunction is tantamount to an impermissible content-based regulation because it prevents activities that could affect the public's marketplace decisions about what beer to purchase. While the Union's theory might raise potentially interesting issues if anchored in the record, see generally Lee Goldman, The First Amendment and Nonpicketing ___ _________ _____________________________________ Labor Publicity Under Section 8(b)(4)(ii)(B) of the National _________________________________________________________________  ____________________ 9Section 8(b)(4) is hedged by two provisos. One declares "[t]hat nothing contained in . . . clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . ." The second proviso, on which the Union relies here, is the so-called "publicity proviso." It stipulates: That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution . . . .  29 U.S.C. 158(b)(4) (1988). 18 Labor Relations Act, 36 Vand. L. Rev. 1469 (1983), it floats free ___________________ of factual support and, therefore, need not concern us. In the first place, we like the district court, see ___ Pye, 875 F. Supp. at 927 remain unconvinced that the Union's ___ affinity group shopping, under the circumstances recounted in the record, can be deemed objectively expressive. At any rate, there is little or no evidence to suggest that the Union's object in mounting group shop-ins was related to publicity in any meaningful sense, or that the participating Union members were actually engaged in expressive activity. In turn, because the group shopping was not a publicity-based appeal to consumers, the principal cases cited by the Union which address the constitutional and statutory status of such activity, DeBartolo _________ included, are simply not relevant to the disposition of this case. In the second place, section 8(b)(4)(ii)(B) is in play as long as forcing one person to stop doing business with another is an object of the allegedly unlawful activity; the statute __ requires neither that the proscribed object be the exclusive object nor even the primary object. See Denver Bldg. & Constr. ___ _______________________ Trades, 341 U.S. at 689; Local Union No. 25 v. NLRB, 831 F.2d ______ ___________________ ____ 1149, 1153 (1st Cir. 1987); Carpet, Linoleum, Soft Tile & ________________________________ Resilient Floor Covering Layers v. NLRB, 467 F.2d 392, 399 n.13 ________________________________ ____ (D.C. Cir. 1972). Thus, whatever mixed motives the Union harbored are of considerably less import once an unlawful object 19 is discerned.10 This is especially true in the precincts patrolled by section 10(l). Even if "[t]he claims of the Union based on the first amendment to the Constitution and on the `publicity proviso' . . . are not insubstantial," Solien v. ______ United Steelworkers of Am., 593 F.2d 82, 88 n.3 (8th Cir.), cert. __________________________ _____ denied, 444 U.S. 828 (1979), it is not for this court to pass ______ upon them during the quintessentially preliminary inquiry that section 10(l) entails. Rather, "[t]he Board should consider the claims in question, and its determinations with respect to them will be subject to review here if any direct proceeding is commenced in this court . . . ." Id. ___ To sum up, it is not the responsibility of the courts to override the Regional Director's interpretation of the facts when that interpretation is rationally supported by the record. Applying this generous standard, we approve the lower court's holding that the Regional Director had reasonable cause to believe that the Union's practice of group shopping was in potential violation of section 8(b)(4)(ii)(B). 2. Legal Theory. We turn next to the question of 2. Legal Theory. ____________ whether the instant case fits within the legal contours of  ____________________ 10It is of some significance that we are here not addressing generally nonobstructive activity at the perimeter of an employer's business situs, as in DeBartolo, but, rather, _________ inherently obstructive activity (even if marginally expressive) conducted inside the establishments of secondary businesses  activity which could unduly "bring [these] neutral, secondary employers into a labor dispute in order to apply pressure on the primary employers," Brian K. Beard, Comment, Secondary Boycotts ___________________ After DeBartolo: Has the Supreme Court Handed Unions a Powerful _______________ _______________________________________________ New Weapon?, 75 Iowa L. Rev. 217, 233 (1989), and thereby ____________ undermine the prescriptive purpose of section 8(b)(4)(ii)(B). 20 section 8(b)(4)(ii)(B). Having mulled the Regional Director's theory that the Union's group shopping amounted to an unlawfully coercive secondary boycott we conclude that it is sufficiently colorable. The legal significance of the practice of group shopping is a matter of first impression. But, the novelty of a Regional Director's legal theory should rarely, in and of itself, foreclose the availability of injunctive relief under section 10(l). Novelty does not necessarily signify insubstantiality. See, e.g., ___ ____ Hendrix, 592 F.2d at 442-43; Squillacote, 540 F.2d at 858; Boire _______ ___________ _____ v. International Bhd. of Teamsters, Etc., 479 F.2d 778, 790 (5th ______________________________________ Cir. 1973); cf. EEOC v. Steamship Clerks Union, Local 1066, 48 ___ ____ ___________________________________ F.3d 594, 607 n.13 (1st Cir. 1995) ("It would be a peculiar rule of construction if a statute could not be applied in a certain manner unless it had already been applied in that manner in a previous case."), petition for cert. filed, 63 U.S.L.W. 3874 ________ ___ _____ _____ (U.S. May 26, 1995) (No. 94-1953). Thus, we hold that a novel legal theory may, if plausible, provide an appropriate foundation for a section 10(l) injunction. We have little difficulty in finding that the Union's group shopping plausibly could be deemed a coercion-based secondary boycott under section 8(b)(4)(ii)(B) and, hence, that there is adequate legal substance behind the issuance of the injunction. The language of section 8(b)(4)(ii) "is pragmatic in its application, looking to the coercive nature of the conduct, 21 not to the label which it bears." Local Union No. 25, 831 F.2d __________________ at 1153 (citation and internal quotation marks omitted). Although group shopping, as conducted by the Union in this case, is a new twist and may not fit the traditional conception of a secondary boycott, see, e.g., Denver Bldg. & Constr. Trades, 341 ___ ____ _____________________________ U.S. at 687 (describing a classic secondary boycott), this qualification mostly serves to earn the Union high marks for ingenuity. Coercion under section 8(b)(4)(ii)(B) is a broad concept, and the NLRB has not hesitated to include varied forms of economic pressure within the conceptual ambit. See, e.g., ___ ____ International Union, United Mine Workers of Am., 304 N.L.R.B. 71, _______________________________________________ 72-73 (1991) (finding unlawful coercion where union members caused a disturbance at a motel housing striker replacements, reasoning that the motel was a neutral employer and the union activity could pressure it to terminate its relationship with the labor supply contractor in order to force the latter to cease doing business with the primary employer), enforced, 977 F.2d ________ 1470 (D.C. Cir. 1992); Local No. 742, United Bhd. of Carpenters & __________________________________________ Joiners of Am., 237 N.L.R.B. 564, 565-66 (1978) (finding that a ______________ union's quid pro quo request for premium pay from a neutral employer was unlawfully coercive because it was actually an effort to cause the modification of that employer's relationship with another employer); Service & Maintenance Employees Union, ________________________________________ Local 399, 136 N.L.R.B. 431, 436-37 (1962) (holding that a __________ union's generally nonexpressive marching around the main entrance of a sports arena, impeding public access, constituted unlawful 22 coercion). Here, though one can imagine more significant forms of economic pressure than associational shopping, we nonetheless believe that the Regional Director's legal theory is sufficiently substantial that the district court's approbatory conclusion must be left intact.11 3. Just and Proper. We come finally to the question 3. Just and Proper. ________________ of whether the injunctive relief structured below can be deemed just and proper in light of the relevant factual and legal circumstances. We conclude that it can. The district court held that injunctive relief is just and proper in this case because of its relationship to two statutory goals: (1) to prevent disruptions in the flow of commerce, and (2) to protect innocent third parties from becoming embroiled in a labor dispute. See Pye, 875 F. Supp. at 928. ___ ___ This threshold determination rests on empirical and legal bedrock. It is indisputable that the statutory proscription of secondary boycotts contemplates both the maintenance of an unhindered stream of commerce, see, e.g., Hoeber, 939 F.2d at ___ ____ ______ 122; Union de Tronquistas, 586 F.2d at 878, and the shielding of ____________________ secondary businesses from unlawful intrusions, see, e.g., ___ ____ International Longshoremen's Ass'n, 456 U.S. at 223 n.20; Denver ___________________________________ ______  ____________________ 11Of course, this ruling means only what it says, and does not speak to whether the Union's contrary view may prevail in the long run. That question is not before us at this time. See, ___ e.g., Madden v. International Hod Carriers', Bldg. & Common ____ ______ ______________________________________________ Laborers' Union of Am., Local No. 41, 277 F.2d 688, 690 (7th _______________________________________ Cir.) (explaining that "[t]he ultimate determination on the merits as to whether a violation occurred is reserved exclusively for the Board, subject to judicial review" at the appropriate time), cert. denied, 364 U.S. 863 (1960). _____ ______ 23 Bldg. & Constr. Trades, 341 U.S. at 692. After all, "[a] union _______________________ has a right to press a recalcitrant employer within the limits of the law; but, [a secondary business] has an equal and correlative right to be protected from becoming a union pawn in an end game directed at some other employer." Local Union No. 25, 831 F.2d __________________ at 1152. On this basis, then, temporary injunctive relief of some sort is clearly just and proper. Starting from this major premise, our focus necessarily becomes the scope of the decree that the lower court actually entered. The Union tells us that the decree is vague and overbroad. We reject this characterization. The injunction's prohibitory ambit is quite clear and its contours are rather specific. Short of cataloguing each and every potential violation, we do not see what further particularization the district court could reasonably have inserted. The requirement that temporary injunctions be clear and specific, Fed. R. Civ. P. 65(d), does not mean that they must read like the working plans for building hydrogen bombs. See Pacific Maritime Ass'n v. ___ ________________________ International Longshoremen's & Warehousemen's Union, 517 F.2d ______________________________________________________ 1158, 1162-63 (9th Cir. 1975). We likewise fail to discern any merit in the Union's allegation of overbreadth. The injunction carefully proscribes certain types of activity, aimed at secondary businesses, undertaken by the Union and other denominated individuals, with a specific (unlawful) intent. No more is exigible. The Union's last-ditch argument is that the injunction 24 should be expressly limited in duration, particularly since it will remain operative until the Board acts, and that agency may not reach a decision on the merits for some time. In support of this argument, the Union cites Eisenberg v. Hartz Mountain Corp., _________ ____________________ 519 F.2d 138 (3d Cir. 1975), in which the court held that section 10(j) injunctions, absent extraordinary circumstances, should be confined to six months in duration. See id. at 144. The Union's ___ ___ reliance on Eisenberg is unavailing. For one thing, that case _________ involves section 10(j), not section 10(l), and the differences between the two provisions are not insignificant. See supra note ___ _____ 7 (contrasting the two provisions); see also Maram, 722 F.2d at ___ ____ _____ 957-58 (explaining why the range of considerations affecting the propriety of injunctive relief varies between sections 10(j) and 10(l)). For another thing, several other circuits have expressly declined to adopt the Third Circuit's inelastic six-month rule, instead leaving the matter of duration to be decided by individual district courts on a case-by-case basis. See, e.g., ___ ____ Sheeran v. American Commercial Lines, Inc., 683 F.2d 970, 980-81 _______ _______________________________ (6th Cir. 1982); Kaynard, 633 F.2d at 1035; Dawidoff v. _______ ________ Minneapolis Bldg. & Constr. Trades Council, 550 F.2d 407, 414 ____________________________________________ (8th Cir. 1977); Squillacote, 540 F.2d at 860. Hendrix typifies ___________ _______ the reasoning of those courts. There, the Eighth Circuit stated: "We find the congressional history indicates that Congress was aware of the lengthy Board hearing procedures when Section 10(l) was enacted. Since Congress did not impose a time limit on a Section 10(l) injunction, we find no reason why this Court should 25 impose such a limit." Hendrix, 592 F.2d at 446. _______ A measure of adjudicatory delay is one of the crosses that contemporary litigants must bear. See, e.g., Maram, 722 ___ ____ _____ F.2d at 960 ("A busy administrative agency cannot operate overnight. The very fact that it must exercise discretion, and that its decision is entitled to presumptive weight, indicate that it should have time to investigate and deliberate.") (footnote and citation omitted). Thus, we abjure the Third Circuit's rule and hold, instead, that the question of whether an injunction issued under section 10(l) should be temporally limited and, if so, to what extent is a matter within the sound discretion of the district court. We add an eschatocol of sorts. By declining the Union's invitation to sponsor a per se durational rule, we in no way intend to condone needless delay in the administrative adjudicatory process. We anticipate that the Board will proceed with dispatch to decide the merits of all section 10(l) cases. If this prediction proves to be overly optimistic in a particular instance, the Union may, if it can make a credible showing that the Board's delay is genuinely undue, ask the district court to modify or dissolve the temporary injunction. See, e.g., Asseo, ___ ____ _____ 805 F.2d at 29 (suggesting that the Regional Director's request for a temporary injunction should be taken as "a promise of a speedy [administrative] disposition, with the risk of dissolution, or modification, by the court, on motion . . ., if the promise is not kept"); Solien, 593 F.2d at 88 (suggesting ______ 26 that if agency action is unreasonably delayed in a section 10(l) case, a union may seek a modification or dissolution of the challenged injunction in the district court). III. CONCLUSION III. CONCLUSION We need go no further. The temporary injunction, as granted, is grounded in the Regional Director's supportable finding of reasonable cause, rests on a credible legal theory, and is suitable in both its proscriptive reach and its temporal scope. Accordingly, we uphold it in all respects. Affirmed. Affirmed. ________ 27