⚓518

In the Matter of Helaine SIMMONDS, Acting Regional Director of the National Labor Relations Board, for and on Behalf of the National Labor Relations Board, Petitioner,

v.

TEAMSTERS LOCAL UNION NO. 122, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL–CIO, Respondent.

CA. No. 96–10132.

United States District Court,
D. Massachusetts.

May 28, 1996.

Kevin J. Murray, National Labor Relations Board, Boston, MA, for Plaintiff.

Stephen R. Domesick, Boston, MA, for Defendant.

## MEMORANDUM

TAURO, Chief Judge.

## I.

## INTRODUCTION

The Acting Regional Director of the National Labor Relations Board (the "Regional Director") petitions this court, pursuant to section 10($l$) of the National Labor Relations Act (the "NLRA"), 29 U.S.C.A. § 160($l$)

(West 1973), to enjoin actions by the Respondent, Teamsters Local Union No. 122, International Brotherhood of Teamsters, AFL–CIO (the "Union"). This dispute arises from the alleged actions of the Union during a radio promotion conducted by August A. Busch & Company of Massachusetts ("Busch") and Infinity Broadcast Corporation of Boston ("WZLX") at the Pour House Restaurant ("Pour House") on December 8, 1995. The Regional Director contends that the Union's actions constituted a secondary boycott in violation of section 8(b)(4)(ii)(B) of the NLRA, as amended, 29 U.S.C.A. § 158(b)(4)(ii)(B) (West 1973).

On January 24, 1996, the Regional Director filed the present petition, together with a motion for judgment on the petition and accompanying affidavits.[1] After hearing argument on the motion on January 26, 1996, the court denied the Regional Director's motion for judgment on the petition and scheduled an evidentiary hearing,[2] leading to the following findings and conclusions.

## II.

### BACKGROUND

Busch is a wholesale distributor of beer, including Budweiser, and related products. (Pet.Ex. 1). The Union represents two employee units at Busch. The collective bargaining agreements covering both units expired on November 13, 1994. Despite ongoing negotiations, the Union and Busch have yet to resolve their differences. During this period, the Union has engaged in a variety of activities purportedly aimed at discouraging consumers from purchasing products distributed by Busch. Transcript of Day 2 of Evidentiary Hearing at 29–30 ("Tr. 2:___").

For the past four years, Busch has engaged WZLX to perform radio promotions of

Budweiser beer at local bars and restaurants. Transcript of Day 1 of Evidentiary Hearing at 6–8 ("Tr. 1:___"). These promotions, referred to as "Chuck's Bar & Grille," are generally held on Friday afternoons from 5:00 to 7:00 p.m. (Tr. 1:7–8). At the promotions, a WZLX disc jockey plays music, distributes Busch and WZLX paraphernalia, and, about five to seven times, performs a "breakaway," which is an interactive segment with the patrons of the establishment that is broadcast live over the radio. (Tr. 1:8–9). Among other things, the disc jockey will ask trivia questions during the breakaway and distribute prizes to the winners. (Tr. 1:9). One of the purposes of the breakaway is to project an image of WZLX as a fun and entertaining station for the radio listener. (Tr. 1:20–22). WZLX considers these breakaways to be an integral part of a successful promotion. (Tr. 1:20).

At promotions conducted at Jose MacIntyre's and the New Place in the Fall of 1995, the Union picketed outside the premises. (Tr. 1:51–52). Members of the Union also entered the establishments and disrupted the promotion by putting false names in WZLX's "register to win boxes" and shouting anti-Busch slogans during the live microphone sessions. (Tr. 1:51). Because of WZLX's concerns about the image these disruptions left for the radio listener, it informed Busch that it would not continue to stage these promotions. (Tr. 1:52; Evidentiary Hearing Exhibit 2 ("Ex. ___")). After consulting with Busch, WZLX agreed to try one more promotion at the Pour House to determine whether the Union would continue to engage in the disruptive conduct. (Tr. 1:9–10). In light of the shouting during the breakaways at the prior promotions, WZLX decided that when the disc jockey went on the "live" microphone to interact with the patrons, the station would not actually broadcast the

1. In support of her petition, the Regional Director submitted prior to the hearing: (1) Unfair labor practice complaint filed by Busch ("Pet.Ex. 1"); (2) Affidavit of Chris Paquin ("Pet. Ex. 2 at ___"); (3) Affidavit of Ronald Sanchez ("Pet. Ex. 3 at ___"); (4) Affidavit of Eric Holt ("Pet. Ex. 4 at ___"); (5) Affidavit of Patrick McCoy ("Pet. Ex. 5 at ___"); (6) Affidavit of Susan Crossley Alexander ("Pet. Ex. 6 at ___"); (7) Affidavit of Kathleen Nunnery Carlson ("Pet. Ex. 7 at ___"). The Union

submitted the First Affidavit of John F. Murphy ("Murphy Aff. ¶ ___").

2. Section 10(*l*) provides that "[u]pon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony." 29 U.S.C.A. § 160(*l*).

event. (Tr. 1:10). WZLX, however, did not announce this decision to the public prior to or at the promotion. (Tr. 1:12).

On December 8, 1995, the Pour House promotion commenced at about 5:00 p.m. (Tr. 1:43). Prior to that time, members of the Union gathered to establish a picket line. (Tr. 1:108). Joe Riley, an alternate steward, was in charge of the Union activity and was taking names of the members that arrived. (Tr. 1:132). As patrons entered the Pour House, picketers made comments such as "Why are you going in there?" and "Don't go in there!" (Tr. 1:14, 36, 67).

On the picket line, the Union displayed at various times two professionally printed banners. (Tr. 1:139–40; Pet. Ex. 5 at 2). One of the banners stated "Boycott Budweiser" and "Teamsters Local 122" and contained a logo depicting a "Bud Weasel." [3] (Tr. 1:140–41; Ex. B; Pet. Ex. 4 at 2; Pet. Ex. 5 at 2). The other banner was identical, except that it read "Boycott Bud Lite". (Tr. 1:141; Pet. Ex. 4 at 2).

The Union members also carried several professionally printed placards. (Murphy Aff. ¶ 15). Some of these placards exhibit statements such as "This Bud's Not For You" or "Boycott Bud," together with the name of the Union. (Murphy Aff. ¶ 15; Pet. Ex. 5 at 2). Others exhibit the Bud Weasel logo, in which the phrase "IBT 122" appears in the red diagonal band, together with a statement such as "This Bud's NOT for you!" and the name of the Union. (Tr. 1:143; Ex. C; Murphy Aff. ¶ 15; Pet. Ex. 3 at 2; Pet. Ex. 4 at 2; Pet. Ex. 5 at 2).

In addition to these printed placards, the Union members carried one homemade sign with the handwritten phrase "Union Busting is Family Busting." (Tr. 2:32–33; Ex. F; Pet. Ex. 3 at 2; Pet. Ex. 4 at 2). The name of the Union was written on the bottom of the homemade sign and Bud Weasel stickers were affixed to it.[4] (Tr. 2:32–33; Ex. F). The Union also distributed a leaflet. (Tr. 1:56,144–45; Ex. D).

Inside the Pour House, members of the Union mingled with other patrons. They engaged in conversations with the patrons, and, when asked for further information distributed Bud Weasel stickers and handed out the leaflets. (Tr. 1:126).

The disc jockey, Tom Sheridan, performed the first "live" microphone at approximately 5:15 p.m. (Tr. 1:45,115). When Sheridan went on the microphone and began asking trivia questions, members of the Union shouted "Bud Weasel" and "Boycott Bud". (Tr. 1:45). The second live microphone, at about 5:35 p.m., was greeted with the same chorus of shouts. (Tr. 1:15–16, 47–48; Carlson Aff. at 3). When one union member correctly answered a trivia question, he stomped on the hat he had received as a prize and tore it into pieces. (Tr. 1:17, 25, 48).

After the second breakaway, WZLX management and Sheridan concluded that they would not take any more "live breaks" that evening. (Tr. 1:18–19, 49). The entire promotion ended approximately half an hour earlier than scheduled, when the manager of the Pour House suggested that it be stopped. (Tr. 1:20, 49). As a consequence of the disruption of the radio broadcasts, WZLX informed Busch that it could no longer conduct radio promotions. (Tr. 1:21).

On December 12, 1995, Busch filed a charge with the National Labor Relations Board (the "Board"), alleging that the Union was engaging in an unfair labor practice by acting in furtherance of a secondary boycott. Pursuant to section 10(*l*), the Regional Director filed the instant petition seeking preliminary injunctive relief.

### III.

### STANDARD FOR A SECTION 10(*l*) INJUNCTION

█ In *Union de Tronquistas de Puerto Rico, Local 901 v. Arlook* ("*Local 901*"), 586

---

**3.** The Bud Weasel logo consists of a cartoonish weasel standing erect. The weasel wears a red tank-top shirt with the phrase "Bud Weasel" and holds in this left paw a can of Budweiser beer. Behind the weasel the universal "no" symbol, a red circle with a red slash struck diagonally across.

**4.** The "Bud Weasel sticker" depicts the Bud Weasel. The statement "This Bud's NOT for you!" appears below the feet of the Bud Weasel and the statement "IBT 122 says" is written on the red diagonal. (Ex. A).

F.2d 872, 876 (1st Cir.1978), the First Circuit held that when the Regional Director believes a union's actions constitute a violation of section 10($l$), she must apply to enjoin the practice.[5] This mandate has been interpreted as Congress' determination that such unfair labor practices "pose so substantial a threat to the free flow of commerce ... that the Regional Director faces a relatively insubstantial burden of proof." *Id.* at 876. As such, *Local 901* outlined a three prong test for section 10($l$) injunctions: (1) "the court must determine whether the Regional Director has reasonable cause to believe that the elements of an unfair labor practice are present;" (2) "[t]he court must conclude that the legal theories relied upon by the Director are not without substance;" and (3) the court "must find that temporary injunctive relief is 'just and proper' in terms of effectuating the purposes of the Act." *Id.*

The First Circuit recently fleshed out the standards embodied in *Local 901*'s three prong test. *Pye v. Teamsters Local Union No. 122,* 61 F.3d 1013, 1020–21 (1st Cir.1995). With respect to the first prong, *Pye* explained that the Regional Director "need only make a minimal evidentiary showing of good reason to believe that the essential elements of an unfair labor practice are in view." *Id.* at 1020. In making that determination, the court should resolve "genuinely disputed issues of material fact ... in favor of the Regional Director." *Id.* To satisfy the second prong, the Regional Director "need not persuade the court ... of her theory's ultimate validity, but she must show that the theory is presentable." *Id.* Finally, "temporary injunctive relief, if otherwise warranted, passes the 'just and proper' test as long as it comprises a reasonable means of ensuring the efficacy of the Board's final order, or preserving the status quo, or permitting administrative proceedings to go forward without undue hindrance, or preventing unjustified interruption of the free flow of

commerce, or forestalling the repetition of unfair labor practices." *Id.* at 1021.

## IV.

## APPLICATION OF SECTION 10(l) STANDARDS

The Regional Director contends that the conduct of the Union members at the Pour House violated section 8(b)(4)(ii)(B) of the NLRA. This section makes it "an unfair labor practice for a labor organization or its agents ... to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where ... an object thereof is ... forcing or requiring any person ... to cease doing business with any other person." 29 U.S.C.A. § 158(b)(4)(ii)(B).

The Regional Director proffers three grounds in support of her allegation that the conduct of union members at the Pour House violated section 8(b)(4)(ii)(B): (1) that the aim of the Union's conduct during the promotion inside the Pour House was to discourage WZLX from conducting future promotions with Busch; (2) that the picketing constituted a secondary boycott because the language of the picket signs insufficiently informed the public about the scope of the boycott; and (3) that the picketing constituted a secondary boycott because statements made by the picketers discouraged consumers from doing business with the Pour House and WZLX. The court treats these issues seriatim.

### A. Conduct Inside the Pour House

#### 1. Reasonable cause

The question at this step in the analysis is whether the Regional Director has reasonable cause to believe (1) that the behavior of the members of the Union inside the Pour House might somehow threaten, coerce, or

---

**5.** This mandatory duty can be contrasted with the Regional Director's discretion under section 10(j) of the NLRA, 29 U.S.C.A. § 160(j) (West 1973). Section 10($l$) applies to violations by unions. Section 10(j), on the other hand, applies to violations by management. Section 10($l$), as already noted, mandates the Regional Director to apply for a preliminary injunction if she believes she has reasonable grounds to conclude that the union has violated the Act. The language of section 10(j), however, leaves the ultimate decision of whether to apply for an injunction to the Regional Director. *See Maram v. Universidad Interamericana de Puerto Rico, Inc.,* 722 F.2d 953, 957–58 (1st Cir.1983).

restrain the Pour House or WZLX, and (2) that an object of the Union's conduct was to force or require such secondary businesses to sever relations with Busch. *Compare Pye,* 61 F.3d at 1021 (explicating reasonable cause inquiry). For the reasons that follow, the court concludes that the Regional Director has satisfied her burden.

The Regional Director has presented numerous witnesses that members of the Union shouted anti-Busch slogans when the WZLX disc jockey went on the purportedly live microphone. Indeed, the witnesses presented by the Union admit that they engaged in such shouting. The Union suggests that the conduct of its members contributed to, rather than distracted from the atmosphere WZLX hoped to create, and that the disc jockey enjoyed the verbal exchanges. (Tr. 1:58, 155–56; Tr. 2:9). The court, however, must draw inferences regarding genuinely disputed issues of fact in favor of the Regional Director. The Regional Director provided credible evidence that the conduct of the Union members undermined the purpose of the promotion and, as such, could have no other effect than coercing WZLX to stop performing radio promotions with Busch. (Tr. 1:19, 46–47).

Though the Regional Director did not produce direct evidence that the object of the Union members was to force WZLX to stop conducting Busch promotions, it is reasonable to infer such an object from their acts. *See Pye,* 61 F.3d at 1022 (union's object may be inferred from its acts). The conduct inside Pour House was undertaken in such a manner as to disrupt the live broadcasts. Members of the Union shouted only when the disc jockey was on the purportedly live microphone. Moreover, such shouting was not essential to the purpose of informing customers in the Pour House about the Union's boycott.

Assuming that members of the Union sought to coerce WZLX, the Union nonetheless maintains that the object of the members of the Union cannot be attributed to it. The Union's contention, however, relies on a fundamental misconception of the scope of this court's inquiry. The Union concedes that the conduct of union members may be attributed to it if the Regional Director shows that the acts occurred within the scope of the apparent authority of those members to act on behalf of the Union; and further concedes that "there are genuine issues of material fact bearing on the apparent authority of the persons identified in the petition." (Trial Memorandum of Local 122 at 6–7). Because the court must resolve genuine factual disputes in favor of the Regional Director, *Pye,* 61 F.3d at 1020, her presentation of credible evidence that the members of the Union acted within the apparent scope of their authority is sufficient to sustain her burden.[6]

Accordingly, the court concludes that the Regional Director has reasonable cause to believe that the elements of an unfair labor practice are present regarding the conduct inside the Pour House.[7]

### 2. *Legal theory*

There can be no question that if the conduct occurring inside the Pour House was authorized by the Union, the Regional Director's theory that such conduct violates section 8(b)(4)(ii)(B) is presentable. Apparently recognizing this fact, the Union merely contends that the Regional Director has presented frivolous legal theories for attributing such conduct to the Union. The court disagrees.

---

**6.** In suggesting that the court should probe more deeply into this factual dispute, the Union mistakenly relies on *John B. Cruz Constr. Co. v. United Broth. of Carpenters and Joiners of America, Local 33,* 907 F.2d 1228 (1st Cir.1990), which involved the merits of an unfair labor practice claim, rather than, as here, a petition for a section 10(*l*) injunction.

**7.** The Regional Director also alleges that several confrontations occurred within the Pour House between union members and Busch personnel attending the promotion. For the most part, the Union concedes that these exchanges took place, but takes issue with the Regional Director's characterization of who initiated them, their severity, and the Union's liability for the isolated conduct of its members. The court declines to resolve these issues in light of its conclusion that other conduct by the Union warrants the injunctive relief sought by the Regional Director with respect to the Union's behavior inside the Pour House.

The Regional Director maintains that the members of the Union were acting within the scope of their apparent authority when shouting during the radio promotion. While, as noted above, there is a factual dispute regarding the ascription of such authority to the members of the Union, that dispute must be resolved in favor of the Regional Director at this stage. Having overcome this hurdle, there is no question that the Regional Director's theory that the Union is liable for conduct performed within the apparent authority of its agents is presentable.

Moreover, the Regional Director offers a second theory to support union liability by analogizing to cases involving the liability of a union for acts of members on an authorized picket line.[8] In *Avis Rent–A–Car System*, the Board explained:

> A union is responsible for the acts of its authorized pickets even if not specifically authorized or indeed specifically forbidden. Nor is it necessary to establish the identity of the picket engaged in the misconduct ... We find the Union had an affirmative obligation to control the actions of the unidentified picket, and cannot escape responsibility by simply contending that neither Business Agent ... nor picket captain ... was present when the misconduct occurred.

280 NLRB 580, 580 n. 3, 1986 WL 53941 (1986). The Regional Director maintains that the affirmative obligation of a union extends beyond the acts occurring in the immediate vicinity of the picket line, here encompassing the acts of picketers who had entered the Pour House. Regardless of whether the Regional Director ultimately prevails on this theory, the court concludes that it is not without substance.

Accordingly, the Regional Director has shown presentable legal theories that the Union violated section 8(b)(4)(ii)(B) under both the apparent authority and affirmative obligation theories.

8. In light of evidence regarding the Union's past practice of picketing radio promotions, (Tr. 1:51–52; Tr. 2:28–29), the use by the picketers of signs and banners owned by the Union, (Murphy Aff. ¶ 15), the presence of alternate steward Riley at the picket, (Tr. 1:132), the recording of names of Union members attending the picket, (Tr. 1:132),

### 3. *Just and Proper*

Under the final prong of *Local 901*, the Regional Director must show that injunctive relief is just and proper. 586 F.2d at 876. This prong is satisfied by a showing that injunctive relief is "necessary to prevent disruptions in the flow of commerce and future unfair labor practices." *Id.* at 878. Here, the Regional Director has put forth credible evidence that WZLX cannot conduct its radio promotions where the Union engages in the conduct discussed above. Moreover, the Union suffers no harm from an order enjoining it from disrupting the promotions as it remains free to employ legitimate methods of informing customers of its dispute with Busch. Accordingly, the court concludes that the Regional Director has shown that injunctive relief, which restrains the Union from engaging in unlawful conduct inside the establishments hosting promotions, is necessary to avert further disruptions in the flow of commerce and to protect innocent third parties from becoming embroiled in a labor dispute.

### B. *The Picket Signs Outside the Pour House*

In *N.L.R.B. v. Fruit and Vegetable Packers & Warehousemen, Local 760 ("Tree Fruits")*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), the Supreme Court held that picketing a retailer with the object of encouraging consumers to refrain from purchasing the goods of the primary employer sold by the retailer did not violate section 8(b)(4)(ii)(B). The Court distinguished legitimate consumer picketing from illicit secondary boycotts, explaining:

> In the [former] case, the union's appeal is confined to its dispute with the primary employer, since the public is not asked to withhold its patronage from the secondary employer, but only to boycott the primary

and the manner in which the Union members learned of the promotion, (Tr. 1:131–32; Tr. 2:13), the court concludes that the Regional Director has reasonable cause to believe that the picket was organized and authorized by the Union.

employer's goods. On the other hand, a union appeal to the public at the secondary site not to trade at all with the secondary employer goes beyond the goods of the primary employer, and seeks the public's assistance in forcing the secondary employer to cooperate with the union in the primary dispute.

*Id.* at 63–64, 84 S.Ct. at 1066–67. Here, the principal issue is whether the Regional Director has reasonable cause to believe that the Union's picketing at the Pour House exceeded the limits of a legitimate consumer boycott.

### 1. *Identification of struck product and the Union*

As an initial matter, the court must explore a factual dispute regarding the content of the signs used by the Union at the Pour House. The Regional Director maintains that a number of the signs failed to identify the struck product and the Union, thereby leaving consumers in doubt as to whether Busch, WZLX, or the Pour House were the object of the picketing. For the reasons stated below, the court concludes that there is no credible evidence to support this factual contention.

As discussed above, the evidence presented at the hearing demonstrates that the Union exhibited two banners, several preprinted placards, and one homemade sign. All of the signs exhibited the name of the Union. Moreover, all of the signs identified the struck product, either by referring to "Bud" and "Bud Light" and/or displaying the Bud Weasel logo.[9]

In contending to the contrary, the Regional Director relies on the testimony of witnesses whose memories of the placards and banners is clearly incomplete. The two principal witnesses upon which the Regional Director relies are Susan Crossley Alexander and Kathleen Nunnery Carlson. Alexander testified that "the only sign [she] noticed was the Bud Weasel sign" and that she could not remember there being any other writing on the sign. (Tr. 1:43–44). Carlson testified that she could only recall one of the signs that were present, which had the word "BUD" with a line through it and no other writing. (Tr. 1:66–67).

Though the court does not doubt the sincerity of these witnesses, their testimony does not provide a credible basis for believing that the picket signs did not identify the Union. Alexander admitted that she was not really looking at the signs because she "wanted to get into the bar." (Tr. 1:44). Carlson stated that, while she recalled that several signs were present, she did not remember their content. (Pet. Ex. 7, Appendix 1 at 2).[10]

The testimony of other witnesses called by the Regional Director tends to corroborate the testimony and physical evidence presented by the Union. Ronald Sanchez, Patrick McCoy, and Eric Holt testified that they observed several printed placards containing an anti-Busch slogan and the Bud Weasel logo, one hand-written placard that read "Union Busting is Family Busting," and banners with the message "Boycott Bud" or "Boycott Bud Light" and the Bud Weasel symbol. (Tr. 1:73,91,108–10). Though these witnesses testified that the name of the Union was not on any of the signs, their descriptions of the signs match the signs produced at the hearing by the Union in every other detail.[11] (Tr. 1:73,91,109–10).

---

9. Though the handwritten portion of the homemade sign did not identify the struck product, the Bud Weasel sticker affixed to the sign (1) reads "This Bud's NOT for you!", (2) shows the weasel wearing a shirt with the phrase "Bud Weasel," and (3) depicts the weasel holding a Budweiser beer can. (Ex. F).

10. The incompleteness of Alexander's and Carlson's memories is highlighted by inconsistencies between their testimony at the hearing and in their affidavit. At the hearing, Alexander testified that the only sign she saw had the Bud Weasel logo, whereas, in her affidavit, she states that she "saw two *types* of signs—one saying

'Boycott Bud' and the other with the weasel insignia with the line drawn through it." (Pet. Ex. 6 at 2). Similarly, in her initial affidavit, Carlson stated that she could only recall one sign that "said 'Bud' with a line through it in a circle." (Pet. Ex. 7, Appendix 1 at 1–2). In a subsequent affidavit, Carlson recalled seeing another sign which exhibited the word "Boycott." (Pet. Ex. 7 at 2).

11. In contrast to their testimony at the hearing, these witnesses did not refer in their affidavits to the presence or absence of the name of the Union on the signs they observed. (Pet. Ex. 3 at 2; Pet. Ex. 4 at 2; Pet. Ex. 5 at 2).

The Regional Director suggests that because these witnesses attested to the absence of the name of Union from the signs, she has met her modest burden. This contention rests on the Regional Director's misreading of the statement in *Pye* that a district court "need not concern itself with resolving conflicting evidence if facts exist which could support the [Regional Director's] theory of liability." *Pye*, 61 F.3d at 1020 (quoting *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir.1988). Though this court need not resolve conflicts between *credible* evidence, it must ascertain whether the evidence submitted by the Regional Director reliably supports the fact for which it is offered. *See Local 901*, 586 F.2d at 876 (Regional Director must show existence of credible evidence). If the mere presentation by the Regional Director of evidence, regardless of its evidentiary quality, were sufficient to sustain a finding of reasonable cause to believe the fact alleged, the statutory right of a respondent to present relevant evidence in opposition to the section 10(*l*) petition would be an empty exercise. In other words, while "the Regional Director must be given the benefit of every legitimate fact-based doubt," *Pye* 61 F.3d at 1020, she must present sufficient evidence to create a legitimate doubt about the contested fact. Here, the ephemeral character of the observations and memories of the witnesses presented by the Regional Director, when viewed against the physical and testimonial evidence presented by the Union, do not create a basis for legitimate doubt about whether the signs displayed the name of the Union.[12]

For these reasons, the court concludes that the Regional Director does not have good reason to believe that the signs used at the Pour House failed to identify the Union or the struck product.

### 2. *Failure to identify the primary employer*

The Regional Director next contends that the failure of picket signs to identify the struck product *and* the primary employer in a consumer boycott is a *per se* violation of section 8(b)(4)(ii)(B). Though the Union concedes that the signs did not contain the words "August A. Busch & Company of Massachusetts," it maintains that the failure to identify the primary employer does not violate section 8(b)(4)(ii)(B) as a matter of law. The court agrees.

In support of her position, the Regional Director relies on the Board's decision in *Meat Cutters Local 248 (Milwaukee Ind. Meat Packers Ass'n)*, 230 NLRB 189, 1977 WL 8768 (1977), *enforced*, 571 F.2d 587 (7th Cir.1978). In *Meat Cutters*, the union engaged in consumer boycott picketing at McDonalds' restaurants and retail stores that purchased lean beef from the employer, "MIMPA," with whom the union was engaged in a dispute. *Id.* at 194–200. The signs asked consumers to boycott "scab meat," but did not identify MIMPA as the primary employer selling such scab meat. *Id.*

Finding that the signs violated section 8(b)(4)(ii)(B), the administrative law judge (the "ALJ") in *Meat Cutters* ordered:

> [I]n the situation here presented, the Union may engage in product picketing under the following restrictions: (1) [t]he picket signs must identify the Union *and* MIMPA [the primary employer] ... and (2) the picket signs must identify the struck product.

*Id.* at *204. (emphasis added). In reaching this result, the ALJ recognized that the operative legal principle was that a "boycotting union must identify the struck product with sufficient clarity to enable consumers to know what products they are being asked to eschew." *Id.* at 203. This legal principle is well established by decisions of the Board and the federal courts interpreting *Tree Fruits*. *See Soft Drink Workers Union Local 812 v. N.L.R.B.*, 657 F.2d 1252, 1263 (D.C.Cir.1980) (*Tree Fruits* stands for the

---

**12.** Because a person making a cursory examination of the signs would likely only recall their dominant characteristics, it is not surprising that the Regional Director's witnesses do not recall seeing the name of the Union. Moreover, in light of the fact that these witnesses were employees of Busch and WZLX, it is not surprising that for them the salient feature of the signs were the anti-Busch slogans and Bud Weasel symbol rather than the name of the Union.

principle that consumer boycotts are illegal if they "fail to distinguish favored from disfavored products with sufficient clarity"); *Carpenters Local 550 (Diamond Industries)*, 227 NLRB 196, 197, 1976 WL 7636 (1976) (consumer picketing "becomes unlawful only when it extends beyond the struck product to embrace other products or parts of the business of the person selling the struck product" and the burden of "making it evident to the consumer that the appeal for a boycott is limited to a specified product rests on the picketing union"); *Typographical Union No. 48 (Atlanta Times Journal, Inc.)*, 180 NLRB 1014, 1016 (1970) (pickets used in a consumer boycott must "adequately inform potential customers [of the secondary employer] of the actions they are asked to take" and "cannot shift [the union's] burden of struck product identification to the public to which it is appealing for support"); *Furniture Workers Local 140 (U.S. Mattress Corp.)*, 164 NLRB 271, 273 (1967) ("[union] did not by the legend on its picket sign, or otherwise, define the limits of its dispute by clearly identifying the primary employer *or* its products so as to make readily apparent to the consuming public precisely against whom its boycott appeal was directed.") (*emphasis added*), *enforced*, 390 F.2d 495 (2nd Cir.), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2056, 20 L.Ed.2d 1363 (1968).

Against the background of these cases, it is clear that the order in *Meat Cutters*, requiring that the union identify the primary employer *and* the struck product, did not announce a new bright line rule. Rather, because the struck product in that case was a generic product, the ALJ and the Board recognized that the phrase "scab meat" failed to inform consumers about which meat products offered by McDonalds' restaurants and the retail stores were the object of the boycott. As the ALJ explained,

> Since the struck product itself cannot be isolated, presumably the picketing can be kept within permissible *Tree Fruits*

bounds by limiting the allowable methods of picketing so as to restrict its effect to the struck product.

*Meat Cutters*, 230 NLRB at 204.[13] One of the means found by the ALJ for keeping the picketing within *"Tree Fruits* bounds" was to require identification of the primary employer. In suggesting that *Meat Cutters* stands for a broader holding, the Regional Director simply fails to distinguish, on the one hand, the legal principles recognized in *Meat Cutters* from, on the other hand, the result which followed from the application of those legal principles to the facts of the case.

Furthermore, the Regional Director offers no argument in support of the notion that the bright line rule she advances is required by the policies underlying federal labor law. In cases involving non-merged products the Board and the federal courts engage in a fact intensive inquiry to determine whether the signs shifted the burden of product identification onto consumers. *See, e.g., Typographical Union*, 180 NLRB at 1015–16; *Furniture Workers*, 164 NLRB at 273. This case-by-case inquiry strikes the proper balance between the right of a union to determine the manner of its expression and the right of secondary employers to be protected from attempts to stop them from doing business with the primary employer. *See Tree Fruits*, 377 U.S. at 77–80, 84 S.Ct. at 1073–75 (J., Black, concurring) (discussing First Amendment implications of governmental regulation of consumer picketing); *Soft Drink Workers*, 657 F.2d at 1263 (explaining that the statutory interpretation issue addressed in *Tree Fruits* influenced by First Amendment concerns).

For these reasons, the court concludes that the Regional Director's contention that the failure of the signs to identify the primary employer violated section 8(b)(4)(ii)(B) as a matter of law is without substance.

---

**13.** The picketing of McDonalds restaurants required a further limitation because McDonalds did not purchase beef directly from MIMPA. Rather, McDonalds purchased meat patties from an intermediary who made the patties by combining MIMPA lean beef with other meat products. Because the MIMPA lean beef was merged in the meat patties sold by McDonalds, the ALJ ordered that, "to the extent that the struck meat is mixed with other products or is not clearly identifiable, the picket signs may not urge consumers to refrain from purchasing." *Meat Cutters*, 230 NLRB at 204–05.

### 3. *Confusion to public*

Even though the failure to identify the primary employer is not a *per se* violation of section 8(b)(4)(ii)(B), the question remains whether the Regional Director has reasonable cause to believe that the signs failed to adequately inform potential customers about the actions the Union wanted them to perform. In maintaining that they did not, the Regional Director contends that the phrase "This Bud's Not For You" and the Bud Weasel logo did not clearly convey a request to boycott Busch products as opposed to a request to refrain from soliciting the Pour House and/or WZLX. The court disagrees.

Though the sufficiency of the language on the picket signs rises or falls by its own terms, *see Typographical Union*, 180 NLRB at 1016 (union could not rely on pamphlets to clarify meaning of picket signs), the words and symbols employed here cannot be understood in a cultural vacuum. The meaning of "Bud" is closely associated in the public mind with the products distributed by Busch. As such, the facts that the signs identified "Bud" left no room for the consumer to confuse Busch with the Pour House or WZLX. Similarly, the symbols employed in the Bud Weasel logo—the prohibitory circle with a slash and the Budweiser beer can—signify the message that the Union wants consumers to refrain from drinking Busch products. And, finally, the message "Boycott Bud" plainly states the Union's objective. *Compare Teamster Local 150 (Coca–Cola Bottling Co. of Sacramento)*, 151 NLRB 734, 739–40 (1965) (signs reading "Teamster Local 150 Protests Unfair Labor Practices of Coca–Cola Bottling Co. Please Do Not Patronize" was sufficient to convey clear message to consumers). In light of the confluence of these messages, there is no reasonable basis for concluding that the picket signs left consumers in doubt about the action requested by the Union.[14]

Moreover, even the Regional Director's evidence supports the view that consumers understood the signs to mean that customers of the Pour House should refrain from consuming Busch products. Alexander testified that she understood the Bud Weasel symbol to signify Busch products, (Tr. 1:55), and that the slogan "This Bud's Not For You" signifies that the Union does not want people consuming Busch products. (Tr. 1:56). McCoy testified that he understood the Union's message to be that consumers should boycott Budweiser products. (Tr. 1:97–98). Significantly, the Regional Director provided no testimony or affidavit averring that a consumer was confused about the message conveyed by the Union's signs.

█ For these reasons, the court concludes that there is no reasonable basis for believing that, as an empirical matter, the signs confused any consumers, or that the content of the signs shifted to the consumer the burden of discerning the action sought by the Union.

### C. *Statements Made By the Picketers*

The Regional Director maintains that the picket violated section 8(b)(4)(ii)(B) because picketers made comments that discouraged customers from doing business with the Pour House and WZLX. There is credible evidence to support the Regional Director's belief that such statements were made. (Tr. 1:14,36,50,67–68,110). Moreover, the effect of and intent underlying such statements is beyond purview.

As it did with respect to the conduct inside the Pour House, the Union maintains that it is not liable for the comments of the picketers. The Union's agency argument, however, is even weaker in this context. For the reasons discussed above, the Regional Director has a reasonable basis for believing that the picket was formed at the behest of the Union. Moreover, even if the evidence of actual authority was insufficient, the Union

---

14. The only sign that could colorably have left the public in doubt was the handmade sign, which read "Union Busting is Family Busting." Though the Bud Weasel stickers affixed to this placard identified the product, the small size of the stickers may have rendered it difficult for consumers to recognize that the message "Union Busting is Family Busting" was restricted to the Union's complaints about Busch products. Even so, the court concludes that in the context of the other placards and banners, the Regional Director lacks reasonable cause to believe that the handmade sign rendered the picket unlawful under section 8(b)(4)(ii)(B).

itself concedes that it provided signs and banners that gave its members the trappings of the Union on the picket line and so ceded them the apparent authority to picket the promotion. Because the Union is responsible for the formation of the picket line, the Regional Director asserts a colorable theory that the Union had an affirmative obligation to control the behavior of those walking the picket. *See, e.g., Avis Rent-A-Car System,* 280 NLRB at 580 n. 3.

■ The court further concludes that the Regional Director has met her burden of showing that injunctive relief for this violation is just and proper. Because the Union intends to engage in consumer picketing at future radio promotions, the past failure of the Union to restrain its members from making improper comments on the picket line presents the prospect of innocent third parties becoming embroiled in a labor dispute.

In crafting an appropriate remedy, the court must narrowly tailor the relief to that which is "reasonably necessary to stop the mischief, prevent additional harm, and ensure effective final relief." *Pye,* 61 F.3d at 1021. The court will, therefore, enjoin the Union and its agents from uttering statements that would tend to encourage customers not to do business with secondary employers selling Busch products. Such an order will maintain the status quo insofar as the Union may continue to engage in lawful consumer picketing while, at the same time, allowing Busch and WZLX to engage in radio promotions without fearing that promotional sites, such as the Pour House, will have customers turned from its doors by statements of picketers.

The Regional Director suggests that because she has succeeded in meeting her burden with respect to comments made by picketers, the court should impose injunctive relief that reaches the content of the picket signs. However, for the reasons discussed earlier, *see supra* IV.B., the court declines this invitation to restrict the content of picket signs used by the Union while engaging in consumer picketing. In so doing, the court, of course, does not grant the Union *carte blanche* with respect to the content of future picket signs, for the content of signs displayed by the Union in the future remain subject to the legal standards articulated in *Tree Fruits* and its progeny. The only issues decided here are (1) that the picket signs used by the Union at the Pour House satisfy those standards, (2) that the Regional Director's contention to the contrary is meritless, and (3) that, while the Regional Director has sustained her burden with respect to the alleged comments of picketers on the line, it would not be just and proper to issue an order for injunctive relief with a broader reach than such verbal conduct.

## V.

### CONCLUSION

For the reasons discussed above, the Regional Director's Petition for Injunction under Section 10(*l*) of the Act is ALLOWED in part and DENIED in part.

An order will issue.

### SUPPLEMENTAL ORDER

The cause came to be heard upon the verified petition of Helaine Simmonds, Acting Regional Director of the First Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board (the "Board"), for a Preliminary Injunction pursuant to section 10(*l*) of the National Labor Relations Act (the "Act"), as amended, pending the final disposition of matters involved herein before the Board. The court, upon consideration of the petition, affidavits and the entire record in the case, concludes that there is reasonable cause to believe that Respondent, Teamsters Local Union No. 122, International Brotherhood of Teamsters, AFL–CIO ("Local 122") has engaged in acts and conduct in violation of section 8(b)(4)(ii), subparagraph (B) of the Act, and that such acts and conduct will be likely to be repeated unless enjoined.

Accordingly, it is ORDERED, ADJUDGED AND DECREED that, pending the final disposition of the matters involved pending before the Board:

1. Local 122, its officers, representatives, agents, servants, employees, and all members and persons acting in concert or par-

ticipation with it (collectively, the "Union") are HEREBY ENJOINED from interfering with or disrupting the radio promotions of Infinity Broadcast Corporation, Inc. ("WZLX"), or any other person, by engaging in verbal or nonverbal conduct during such promotions inside the premises of The Pour House Restaurant (the "Pour House"), or any other place in which such promotion takes place, where an object thereof is to force or require WZLX, the Pour House, or any other person, to cease selling the products of or to cease doing business with August A. Busch & Company of Massachusetts, Inc. ("Busch"). Such prohibited conduct includes, but is not limited to, shouting "Budweasel," "Boycott Bud," and similar slogans during the radio promotions. And,

2. The Union is HEREBY ENJOINED from making oral statements while engaged in consumer boycott picketing of Busch products at the Pour House, or at any other place engaged in selling Busch products to consumers, where an object thereof is to threaten, coerce, or discourage consumers from entering the premises of or doing business with such establishments.

IT IS SO ORDERED.

