**Mary Zelma ASSEO, Regional Director of the Twenty Fourth Region of the National Labor Relations Board, for and on Behalf of the National Labor Relations Board, Petitioners, Appellees,**

v.

**CENTRO MEDICO DEL TURABO, INC. and Joaquin Rodriguez d/b/a Turabo Medical Center Limited Partnership d/b/a Hospital Interamericano De Medicina Avanzada, Respondents, Appellants.**

No. 89–1874.

United States Court of Appeals, First Circuit.

April 5, 1990.

Rubén T. Nigaglioni, Hato Rey, P.R., with whom Heber E. Lugo Rigau, Ledesma, Palou & Miranda, Hato Rey, P.R., was on brief for respondents, appellants.

Theresa M. Squillacote, Attorney, N.L.R.B., with whom Jerry M. Hunter, General Counsel, was on brief for petitioners, appellees.

Before BREYER, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

This is an appeal from an order of the United States District Court for the District of Puerto Rico granting the National Labor Relations Board's petition for temporary injunctive relief. For the reasons specified below, we affirm the district court's order. Although the record is replete with detail, we constrain ourselves here to reciting only those facts essential to this appeal.

## I. BACKGROUND

Hospital San Rafael, Inc. (San Rafael) operated a 104 bed hospital in Caguas, Puerto Rico from 1958 to 1988. By the late 1970's, however, the limited capacity of San Rafael, as well as its deteriorating physical plant, rendered it unable to adequately meet the needs of the community. Two groups applied to the Department of Health of the Commonwealth of Puerto Rico for a Certificate of Need and Conve-

nience to establish another hospital in Caguas: Turabo, doing business as the Hospital Interamericano de Medicina Avanzada (HIMA), and the Caguas Doctors' Hospital Group. After the Certificates were obtained, both groups applied to the United States Department of Health and Human Services for federally-funded mortgage insurance, a prerequisite to obtaining financing for the projects. The agency refused to finance competing hospitals, and funding was consequently refused to both groups.

The Certificates issued to Turabo and Doctors' Hospital were conditioned on San Rafael's cessation of operations. To meet this condition, Turabo proposed, and San Rafael agreed, that by October, 1983, San Rafael would surrender its Commonwealth Operation License, in exchange for signing a License Surrender Agreement and $1,000,000 from Turabo. Turabo also paid $800,000 to Doctors' Hospital so that it would surrender its Certificate of Need, which would then allow Turabo, as the sole applicant for hospital financing, to obtain federally-funded mortgage insurance.

In May, 1983, a feasibility study commissioned by Turabo was completed. The study projected that the new facility would have at least 300 beds, which in turn would require a substantially larger work force than that needed by San Rafael. The study assumed that the new facility's service area would be the same as that of San Rafael, and that the "San Rafael Hospital physicians would form the core of the active staff faculty at the [new facility]."

Between 1983 and 1985, San Rafael informed its employees of the plans for the new facility in the in-house publication, *Hablemos*. A thorough report on the imminent construction and planned physical layout, and of the new corporate officers of Turabo, was presented to the San Rafael employees in the Winter, 1985 issue of that publication.

In 1983, simultaneous with the development of plans for the new facility, the Union commenced an organizing drive among the employees of San Rafael. Prominent among the employees in the

drive was X-ray technician Milton Suárez, who had been employed at San Rafael since October, 1980. He visited employees at their homes, distributed Union literature in front of the Hospital, and conducted organizational meetings. Suárez' activities were well-known to the management officials of both San Rafael and Turabo.

The Union won Board-conducted elections in two units at San Rafael—one consisting of all registered nurses, and the other consisting of licensed practical nurses, technicians and clerks (technical unit). On January 30, 1984, the Union was certified as the collective-bargaining representative of San Rafael employees in both units.

Thereafter, San Rafael and the Union negotiated a collective bargaining agreement, effective from September 1, 1984 through August 31, 1987. Prior to the expiration of that contract, the parties commenced bargaining for a successor agreement. During these negotiations, the Union sought, and San Rafael opposed, a provision that would have obligated Turabo to recognize and bargain with the Union or to apply the terms of the collective bargaining agreement at the new facility. By the last bargaining session on September 14, 1988, the parties were unable to reach agreement on a successor contract. During these negotiations, however, the Union and Turabo entered into a private agreement settling certain unfair labor practice charges that the Union had filed against Turabo and San Rafael. Under that agreement, Turabo agreed to hire a minimum of 95% of the San Rafael unit employees when it opened its new facility.

In June, 1988, San Rafael Executive Vice President Carlos Piñeiro prepared a staffing guideline for Turabo's new facility. That guideline projected the job classifications, and the number of employees within each classification, for each of four projected phases by which Turabo would reach its maximum operation potential. By mid–1988, construction of the new facility was substantially completed.

On October 9, 1988, Turabo opened HIMA and commenced hiring employees. In a visit to the facility on October 27, 1988, Suárez and Union Propaganda and Education Secretary Miguel González met with Piñeiro, who had become Executive Director of HIMA. Piñeiro said that Turabo did not recognize the Union at HIMA, nor did it acknowledge that the terms of the collective bargaining agreement were applicable there. He then directed the two men to the personnel director for further discussion. At that time, Suárez submitted his application for employment at HIMA.

On November 3, 1988, San Rafael began closing its facilities, and on November 7, Suárez received his notice of discharge. By November 13, San Rafael had completely ceased all operations, and ultimately sold $242,602 of its moveable equipment to Turabo for use at the HIMA facility. San Rafael also transferred to Turabo a portable X-ray unit which it had under lease.

On November 14, 1988, Turabo began providing medical services. By November 19, Turabo had hired 69 employees in the job classifications which had comprised the technical unit at San Rafael. Of those 69 employees, 51, or 74%, were former San Rafael unit employees.

On November 23, 1988, and again on December 19, 1988, the Union sent letters to Turabo requesting that it recognize the Union at HIMA. On January 5, the Union received letters from the president of the HIMA and from Turabo's attorney, which expressed their refusal to recognize the Union, denied any obligation to do so, and asserted that Turabo had already fully complied with its only obligation: to hire 95% of the former San Rafael unit employees.

In conversations during the first four months of 1989, HIMA employees told the Union that they would not cooperate further with the Union nor engage in activities that would identify them with the Union because of fears of reprisal by Turabo. One employee said that she had already experienced what she perceived to be a warning from a Turabo official not to engage in Union activities.

Between the date of its opening and April 15, 1989, Turabo gradually increased the size of its operation, until it was operat-

ing 138 beds. It employed 108 employees in former technical unit positions to maintain that operational level.

Based on this record, the district court concluded that reasonable cause existed to believe that Turabo is a legal successor to San Rafael and that, when Turabo had hired a substantial and representative complement of employees, a majority of Turabo employees in positions which had been part of the San Rafael technical unit were former San Rafael employees. The court found that there was reasonable cause to believe that Turabo had violated Section 8(a)(5), 29 U.S.C. § 158(a)(5), by refusing to recognize and bargain with the Union. The court also found reasonable cause to believe that Turabo violated Section 8(a)(3), 29 U.S.C. § 158(a)(3), by refusing to hire Suárez because of his Union activities. Finally, the court determined that the preliminary injunctive relief requested by the Board was just and proper to preserve the Board's ability to ultimately afford meaningful relief in the underlying unfair labor practice case.

## II. APPLICABLE STANDARD FOR INJUNCTIVE RELIEF UNDER § 10(j)

■ Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) (1982), authorizes district courts to grant interim injunctive relief to restore and preserve the status quo pending the Board's decision on the merits of an underlying unfair labor practice complaint. *E.g., Asseo v. Pan American Grain Co., Inc.,* 805 F.2d 23, 25 (1st Cir.1986); *Fuchs v. Hood Industries, Inc.,* 590 F.2d 395, 397 (1st Cir.1979). Under this statutory scheme, the district court is limited to the determination of whether there is (1) reasonable cause to believe that a violation of the Act, as alleged, has been committed, and (2) whether injunctive relief is appropriate under the circumstances. *Asseo v. Pan American Grain Co., Inc.,* 805 F.2d at 25; *Maram v. Universidad Interamericana de Puerto Rico,* 722 F.2d 953, 959 (1st Cir.1983).

As we have previously stated, on appeal, this Court's review is:

limited to [determining] whether the district court was clearly erroneous in finding reasonable cause to believe that there were unfair labor practices and whether it abused its discretion in granting injunctive relief. *Unión de Tronquistas de Puerto Rico v. Arlook,* 586 F.2d 872, 876 (1st Cir.1978).

*Asseo v. Pan American Grain Co., Inc.,* 805 F.2d at 25. With these standards firmly in mind, we turn now to the merits of the appeal.

## III. EXISTENCE OF REASONABLE CAUSE

■ As this Court has previously made crystal clear, the district court is not empowered to decide the merits of the case, that is, whether an unfair labor practice occurred. *Asseo v. Pan American Grain Co., Inc.,* 805 F.2d at 25. Instead, the district court is charged only with the responsibility of ensuring that there is reasonable cause to believe that a violation of the NLRA occurred. *E.g., Maram v. Universidad Interamericana de Puerto Rico,* 722 F.2d at 958. In this Circuit, this is accomplished through a determination that the Regional Director's position is fairly supported by the evidence. *See Asseo v. Pan American Grain Co., Inc.,* 805 F.2d 23; *Maram v. Universidad Interamericana de Puerto Rico,* 722 F.2d at 959. After review of the evidence presented, we cannot say that the district court's finding of reasonable cause was clearly erroneous.

### A. Refusal to Recognize and Bargain with the Union

■ Section 8(a)(5), 29 U.S.C. § 158(a)(5), makes it an unfair labor practice for an employer to refuse to recognize and bargain with the collective bargaining representative of its employees. Under this standard, an employer is obligated to recognize and bargain with the union representing its predecessor's employees if: (1) the new employer is a "successor" to the old, *i.e.,* if there is substantial continuity between the two employing entities; and (2) a majority of the successor's employees previously were employed by the predecessor. *Fall River Dyeing & Finishing*

*Corp. v. NLRB,* 482 U.S. 27, 43–52, 107 S.Ct. 2225, 2236–41, 96 L.Ed.2d 22 (1987). If these criteria are satisfied, a rebuttable presumption of majority status arises, leading to a consequent duty to bargain in good faith. The successor employer, however, may defeat that presumption by demonstrating either that the union has lost majority support, or that it has sufficient objective evidence of a good faith doubt of majority status.

### 1. *Successor Status of HIMA*

■ The determination of whether a new company is a successor to the old is largely factual in nature. In making its inquiry, it is well settled that the Board (or the court, where it is the factfinder) must direct its attention to the question of whether the new company has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182, 94 S.Ct. 414, 424, 38 L.Ed.2d 388 (1973). *See also NLRB v. Burns International Security Services,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). From these vague beginnings, the standard has developed into one with more definitive parameters:

> [T]he focus is on whether there is "substantial continuity" between the enterprises. Under this approach, the Board examines a number of factors: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. at 43, 107 S.Ct. at 2236 (citations omitted). Given the emphasis of the law on furthering "industrial peace," these factors must be weighed in light of whether "those employees who have been retained will understandably view their job situations as essentially unaltered." *Id.*

*See Golden State Bottling Co.,* 414 U.S. at 184, 94 S.Ct. at 425.

■ Although application of a balancing test is always a delicate proposition, after careful analysis we are unable to say that the district court was clearly wrong in concluding that Turabo was indeed a successor to San Rafael. While we think it unnecessary to parrot each of the district court's findings, upon review, we find that it was not clear error for the district court to hold that the $1,000,000 payment for the License Surrender Agreement, which was necessary for Turabo even to operate a hospital in Caguas, together with the purchase of $242,602 worth of equipment, and the lease of an X-ray unit, constitute the acquisition by Turabo of substantial assets of San Rafael. That this may have represented only a small portion of its total investment in Turabo is not dispositive—the focus is upon San Rafael.

The remaining criteria for successorship merit little discussion. It can scarcely be contested that Turabo is engaged in the same business of providing health care services to substantially the same community as had San Rafael. Moreover, it cannot be clear error to have concluded that the former San Rafael technical unit employees perform substantially the same functions at HIMA as they formerly did at San Rafael—indeed, appellant never argues otherwise. We also think that it is significant that the corporate management of Turabo and San Rafael are substantially identical, particularly with regard to key management personnel. Consequently, after careful analysis, we find that there is reasonable cause to believe that Turabo is the legal successor to San Rafael.

### 2. *Union's Majority Status*

■ Having established that Turabo is San Rafael's successor, our inquiry next shifts to the district court's determination that the Union enjoyed majority status. As the Supreme Court has made clear, a union's majority status is measured at the time the successor has hired a "substantial and representative complement of its employees." *Fall River Dyeing & Finishing*

*Corp. v. NLRB,* 482 U.S. at 47, 107 S.Ct. at 2238. "If, at this particular moment, a majority of the successor's employees had been employed by its predecessor, then the successor has an obligation to bargain with the union that represented these employees." *Id.*

While we cannot say that, had we been sitting as the district court or as the Regional Director of the Board, we would have chosen November 19, 1988 as the date by which HIMA had reached a substantial and representative complement of employees, neither can we say that the district court or the Regional Director were clearly wrong for so choosing. And our role as an appellate court is merely to review the district court's findings, not to make new ones.

■ An employer has hired a "substantial and representative complement of employees" when it has filled or substantially filled the job classifications designated for the operation, and it is engaged in normal or substantially normal production. *Id.* at 49, 107 S.Ct. at 2239. *See also Premium Foods, Inc. v. NLRB,* 709 F.2d 623, 628 (9th Cir.1983). In making this determination, the Board must consider "the size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work ... as well as the relative certainty of the employer's expected expansion." *Premium Foods, Inc. v. NLRB,* 709 F.2d at 682 (cited in *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. at 49, 107 S.Ct. at 2239).

■ The district court concluded that there was reasonable cause to believe that Turabo had reached substantially normal operation and substantially filled its job classifications by November 19, 1988. By November 19, Turabo was operating 50 beds, and was providing a substantially full range of services. Although 50 beds represented only ⅓ of the beds contemplated under Phase I operation, in light of the fact that it was providing all of the health ser-

vices which it would ultimately supply (except Intensive Care), albeit on a smaller scale, the district court's conclusion was not clearly erroneous. *See Briggs Plumbingware v. NLRB,* 877 F.2d 1282 (6th Cir. 1989) (substantially normal operations achieved where all steps of production process were in operation). Thus, on November 19, Turabo had also substantially filled the unit employee complement that it expected to hire upon reaching full Phase I operation. *See, e.g., NLRB v. Hudson River Aggregates,* 639 F.2d 865 (2d Cir.1981).

■ Since, on November 19, 1988, 74% of the technical employees were former members of San Rafael's technical unit, the district court acted reasonably in concluding that the Union could be presumed to have majority support among those employees. The fact that Turabo might ultimately hire many more employees is not dispositive, given that expansion beyond the Phase I 150–bed level was contingent on the existence of a demand for additional beds. *Compare Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. at 52, 107 S.Ct. at 2240 (since employer's intent to expand to two shifts was contingent upon growth of business, projected size of second shift was irrelevant).[1]

■ The presumption created by this *prima facie* demonstration of majority support, however, is only a rebuttable one. It can be overcome with a showing of: (1) actual loss of majority support, or (2) objective considerations sufficient to support a reasonable good faith doubt of the Union's continued majority. *Id.* at 41, n. 8, 107 S.Ct. at 2235, n. 8 (citing *Harley–Davidson Transp. Co.,* 273 NLRB 1531 (1985)).

■ Appellant never argues that there was an actual loss of majority support, although it does contend that it had a good faith doubt as to the Union's majority status. In so arguing, it relies upon a decertification petition filed on January 11, 1988, and signed by 35 of the 79 technical unit

1. Nor is it fatal to the district court's conclusion that only 50 of the 150 beds which would signal completion of Phase I were in operation on November 19, 1988. By November 19, 1988, Turabo had hired 64% of the actual number of employees hired by April 15, 1989, when it was close to reaching the 150–bed level of operation.

employees at San Rafael. That petition, however, had previously been dismissed by the Board, because of the pendency of unfair labor practice proceedings. As the district court stated, the Board, in similar cases, has held that petitions filed under these circumstances do not constitute sufficient objective evidence to deny recognition to the certified bargaining agent. *See, e.g., Dresser Industries*, 264 NLRB 1088 (1982); *Massey–Ferguson, Inc.*, 184 NLRB 640, 641 (1970), *enforced Massey–Ferguson, Inc. v. NLRB*, 78 LRRM (BNA) 2289, 1971 WL 2981 (7th Cir.1971). We do not find the district court's reliance on the procedures of the Board misplaced.

▮ Given that the Union demanded recognition on October 27, 1988, and again on November 23 and December 19, and that those demands were rejected by Turabo, we affirm the district court's conclusion that there is reasonable cause to believe that § 8(a)(1), 29 U.S.C. § 158(a)(1) and § 8(a)(5), 29 U.S.C. § 158(a)(5), were violated when Turabo refused to recognize the Union after November 19, 1988, and thus that the Regional Director's position was supported by the record.

### B. *Refusal to Hire Milton Suárez*

▮ Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), prohibits an employer from discriminating with regard to the hiring or tenure of employees for the purpose of discouraging union membership. The cases which have interpreted and applied this section have made it clear that a successor employer violates this provision when it refuses to hire employees of the predecessor employer because of their union activities. *See Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 262 n. 8, 94 S.Ct. 2236, 2243 n. 8, 41 L.Ed.2d 46 (1974); *NLRB v. Burns International Security Services*, 406 U.S. 272, 280–281 n. 5, 92 S.Ct. 1571, 1578–1579 n. 5, 32 L.Ed.2d 61 (1972).

▮ We need not repeat all the facts relied upon by the able district court. Suf-

fice it to say that the evidence supported a conclusion that Milton Suárez was an active union participant at San Rafael, and made his union activities known to officials at HIMA. Although Turabo contended that it did not extend an employment offer to Suárez because of his excessive absenteeism at San Rafael, the district court was not clearly wrong in concluding that, because the personnel records of other employees who were hired by Turabo evidence similar absenteeism, there was reasonable cause to believe that Turabo's proffered reasons for not hiring Suárez were merely pretextual. *See D'Youville Manor Nursing Home v. NLRB*, 526 F.2d 3 (1st Cir. 1975). The fact that other union supporters were hired at HIMA does not negate the discrimination claim.

Given these circumstances, the district court was not clearly wrong in concluding that the Regional Director's claims that unfair labor practices had been committed were supported by reasonable cause.

### III. PROPRIETY OF INJUNCTIVE RELIEF

Having concluded that the district court was not clearly erroneous in finding reasonable cause to support the Regional Director's position, our inquiry next focuses on whether the district court abused its discretion in determining that the injunctive relief awarded was just and proper. *See Asseo v. Pan American Grain Co., Inc.*, 805 F.2d at 26; *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 748 (9th Cir.1988).

▮ As this Court has previously made clear, while the Regional Director's decisions are entitled to deference on the part of the courts, that deference is not unfettered. *Maram v. Universidad Interamericana de Puerto Rico*, 722 F.2d at 958. Although other portions of the National Labor Relations Act make it apparent that judicial review is limited in various respects, § 10(j) provides no such guidance.[2]

---

**2.** Section 10(j), 29 U.S.C. § 160(j), provides that: (j) The Board shall have power, upon issuance of a complaint as provided in subsec-

tion (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States

This Court has previously held that, "when the Board simply has discretion under the general section 10(j), we believe the whole panoply of discretionary issues with respect to granting preliminary relief must be addressed by the court." *Maram v. Universidad Interamericana de Puerto Rico*, 722 F.2d at 958.

In this Circuit, the standards for granting preliminary injunctive relief are unambiguous:

> (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Women's Community Health Ctr., Inc. v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979) (quoted in *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981); *Asseo v. Pan American Grain Co., Inc.*, 805 F.2d at 26). *See also Levesque v. Maine*, 587 F.2d 78, 80 (1st Cir.1978).

 With these factors clearly in mind, we turn now to the injunctive relief at issue here. The district court enjoined Turabo to: (1) recognize and bargain collectively in good faith with the Union representing the technical unit employees, (2) offer employment to Milton Suárez, and (3) post copies of its Opinion and Order at HIMA both in English and Spanish. Upon review, we cannot say that the district court abused its discretion in imposing this relief.

The district court concluded that an interim bargaining order was the only effective way to prevent irreparable erosion of employee support for the Union. Not only does the record contain evidence that several HIMA technical unit employees indicated to the Union that they would not continue to support it because they feared retaliation by their employer, but it demonstrates that Milton Suárez, a chief union organizer, had not been hired by Turabo. Whether Suárez was not offered employment because of his union activities, is clearly a matter for the Board to determine. *E.g., Asseo v. Pan American Grain Co.*, 805 F.2d at 25. However, after careful review we cannot conclude that the district court abused its discretion in determining that an interim offer of employment to Suárez was necessary to dispel employees' fears that they would suffer comparable retaliation if they chose to continue their support for the Union.

As the district court concluded, there was a very real danger that if Turabo continued to withhold recognition from the Union, employee support would erode to such an extent that the Union could no longer represent those employees. At that point, any final remedy which the Board could impose would be ineffective. *See Aguayo v. Tomco Carburetor Co.*, 853 F.2d at 748. Moreover, Suárez' absence could reasonably contribute to this erosion of support.

The preceding discussion obviously focuses on one element of the preliminary injunction standard: whether the Union would suffer irreparable injury if the injunction was not granted. Having concluded that it would, we now turn to the question of whether the final three elements are met. We conclude that they are.

First, the danger that the Union would lose support because of unfair labor practices committed by the employer, leading to irreparable injury to the employees and to the bargaining unit, clearly outweighs any harm which granting injunctive relief would inflict on the defendant. Indeed, the only argument which Turabo seriously advanced at the district court level was that "granting the interim bargaining order will be tantamount to imposing an unwanted Union on the employees, which will create labor unrest and adversely affect the Em-

---

district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the

filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

ployer's prospects of obtaining necessary financing to continue its operations." We, like the district court, fail to find merit in this contention.

Second, although the question of likelihood of success on the merits is a more difficult issue, again, we are satisfied with the district court's conclusion that there is reasonable cause to believe that the alleged unfair labor practices were committed, and that there is substantial likelihood of success on the merits. These conclusions were not an abuse of discretion on the part of the district court.

Finally, we agree with the district court's conclusion that the public interest will be furthered by the imposition of the interim injunctive relief. If the goal of the labor laws and regulations is to strengthen the bargaining process, *see Asseo v. Pan American Grain*, 805 F.2d at 28, then ordering bargaining to commence cannot be contrary to the public interest.

## IV. CONCLUSION

Interim injunctive relief is warranted for the "preservation or restoration of the status quo ... when the circumstances of a case create *a reasonable apprehension* that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless ..." *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir.1967). Because we find, not only that there was reasonable cause to support the Regional Director's position that unfair labor practices had occurred, but also that injunctive relief was both correct and proper, the order of the district court granting such relief is hereby affirmed. Nothing in this opinion should in any way be interpreted as a prejudgment of the merits of the unfair labor practice charges, which, at this point, remain to be litigated.

*Affirmed.*