**Alan B. REICHARD, Regional Director of the Thirty–Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**FOSTER POULTRY FARMS, Respondent.**

**No. 1:06–CV–0238 OWW LJO.**

United States District Court, E.D. California.

March 28, 2006.

Amy Lyn Berbower, Oakland, CA, for Petitioner.

Steven R. Feldstein, Heller Ehrman LLP, Menlo Park, CA, for Respondent.

## ORDER GRANTING PETITION FOR TEMPORARY INJUNCTION (29 U.S.C. § 160(j))

WANGER, District Judge.

### I. INTRODUCTION

Petitioner Alan B. Reichard ("Petitioner"), Director of the Thirty–Second Region of the National Labor Relations Board, on behalf of the Board petitions for a temporary injunction under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), requiring Respondent Foster Poultry Farms ("Respondent") to recognize and bargain with the League of Independent Workers ("the League") during the time the National Labor Relations Board ("NLRB" or "the Board") considers the pending unfair labor practice complaint against Respondent. Respondent opposes the motion.

### II. PROCEDURAL HISTORY

On February 24, 2006, the Board unanimously authorized Petitioner to seek a 10(j) injunction against Respondent pending the NLRB's decision in the administrative hearing case. Doc. 2, Mem. in Supp, 2. The petition and memorandum in support were filed on March 1, 2006. Doc. 1, Pet.; Doc. 2, Mem. in Supp. The memorandum in opposition was filed by Respondent on March 15, 2006. Doc. 32, Mem. in Opp. The reply was filed on March 17, 2006. Doc. 38, Reply.

### III. BACKGROUND

Respondent is a family-owned-and-operated business engaged in the production of poultry products. Respondent was founded in 1939 and has been headquartered in Livingston, California since the 1950s. Over 2,400 employees work at the Livingston facility. In 2003, Respondent's Livingston employees were represented by the United Food and Commercial Workers. In 2003, the bargaining unit employees voted to decertify the UFCW.

The League of Independent Workers was formed in 2004 to represent Respondent's workers. Ralph Meraz is the League's primary spokesman.

On or about November 7 and 8, 2004, the League and the UFCW participated in an election to represent various employees of Respondent at the Livingston facility. Two thousand four of 2,303 eligible voters cast ballots in the November 2004 representation election. Of the 2,004 votes cast in the election, 1,151 employees cast ballots for the League and 142 employees for the UFCW. Seven hundred six employees voted against union representation of any kind. The Board certified the League as Respondent's employees' bargaining representative shortly thereafter in 2004.

Respondent recognized the League and began labor negotiations. The parties met on at least a dozen occasions over the next six months. Meraz negotiated on behalf of the League. Negotiations reached impasse in early May 2005. No contract was in place.

The International Association of Machinists and Aerospace Workers ("IAM") is an international organization with over 730,-000 members across North America. District Lodge 190 of the IAM represents over 14,000 workers in California and Nevada who perform craft and trade work. District Lodge 190 has assets totaling over $500,000 and is governed by its own constitution and bylaws as well as the IAM constitution and bylaws.

The League conducted an affiliation vote on September 11, 2005, to determine whether it would affiliate with the IAM. Any current employee at the Livingston plant was allowed to vote. Aff. & Ex., 3, 25. Of the roughly two thousand eligible voters, id., 21, 25, nine hundred forty-three employees voted, id., 25. Nine hundred eighteen votes were cast in favor of affiliation, twenty-one against, and there were four blank ballots. Id., 25, 51. After the affiliation vote, the IAM sent a letter to Respondent seeking to re-start negotiations. Respondent replied that it did not recognize the League as having properly affiliated with IAM, and would not engage in negotiations. Doc. 32, Mem. in Opp., 3–8.

On or about January 9, 2006, Petitioner issued a complaint alleging that Respondent violated the National Labor Relations Act, 29 U.S.C. § 151, et seq., by declining to negotiate with and provide certain information to the League. Petitioner now requests an injunction to require Respondent to recognize and bargain with the League during the pendency of the administrative proceedings and Board decision which are represented to last two to three years.

## IV. LEGAL STANDARD

Title 29, Section 160, of the United States Code provides in relevant part:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

■ To secure relief under section 10(j), the Regional Director must show "either (1) a combination of probable success on the merits and the possibility of irreparable harm or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits." *Miller v. California Pacific Med. Ctr.*, 19 F.3d 449, 456 (9th Cir.1994) (quoting *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 977 (9th Cir.1992)). This formulation reflects the traditional "sliding scale" of equity jurisprudence where "the required degree of irreparable harm increases as the probability of success decreases." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir.1987); *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 398 (9th Cir.1992) ("where the government can make only a colorable evidentiary showing of a violation, the court must consider the possibility of irreparable injury"). In *Miller*, this traditional formu-

lation was modified in one respect. In the context of a section 10(j) petition, the court must evaluate the traditional equitable criteria "through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller,* 19 F.3d at 459–60. The Board's ability to meaningfully adjudicate disputes arising within its jurisdiction must be balanced against the respondent's showing of hardship. *Id.* at 460. *Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates,* 241 F.3d 652, 661 (9th Cir.2001).

## V. ANALYSIS

### 1. Likelihood of success on the merits

As an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits. Where the moving party shows only a "fair" chance of success on the merits, in contrast to "probable" success on the merits, the party also must show there are serious questions going to the merits of the case and that the balance of the hardships tips decidedly in its favor. *Miller,* 19 F.3d at 460.

■ In assessing whether the Board has met its burden, it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals. *See NLRB v. City Disposal Sys., Inc.,* 465 U.S. 822, 829, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984) ("[O]n an issue that implicates [the Board's] expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference[.]"); *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) ("Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another

view of the statute."). While the district court is not required to defer to the Board in deciding whether interim relief is "just and proper," it should evaluate the probabilities of the complaining party prevailing in light of the fact that ultimately, the Board's determination on the merits will be given considerable deference. By the same token, because it is the Board and not the district court which has primary responsibility for declaring federal labor policy, even on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel. In short, the Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory. *Miller,* 19 F.3d at 460.

If the respondent concedes the substance of the unfair labor practice charge, or if the Board demonstrates that it is likely to prevail on the merits, the court presumes irreparable injury. If the charge is disputed, or if the Board has only a fair chance of succeeding on the merits, the court must consider the possibility of irreparable injury. *Id.*

■ An employer has an obligation to bargain with a successor union where an affiliation vote is conducted with adequate due process safeguards and where the organizational changes are not so dramatic that the post-affiliation entity lacks substantial continuity with the pre-affiliation union. *Sullivan Bros. Printers,* 317 N.L.R.B. 561, 562 (1995), enf'd 99 F.3d 1217 (1st Cir.1996). Respondent has the burden of proof on each of these factors, *Ridgewell's, Inc.,* 334 N.L.R.B. 37, 42 (2001), by a preponderance of the evidence, *J.W. Fergusson & Sons,* 299 N.L.R.B. 882 n. 2 (1990) (due process), *Whitewood Maintenance Co.,* 292 N.L.R.B. 1159, 1209 (1989) (continuity).

Although most union mergers/affiliations result in some degree of change to the union's organizational structure, the Board will intervene in such internal union matters only where it finds that the affiliation raises a question concerning representation and, consistent with this approach, the Board will interject itself only in the most limited of circumstances involving such internal changes. *Sullivan Bros.,* 317 N.L.R.B. at 562. Here, the Board has made such a decision and seeks to preserve bargaining representative status for the League pending the outcome of a Board decision on the merits.

a. Due Process

■ Regarding the due process factor, the Board focuses on whether the members received adequate notice of the vote, whether there was adequate opportunity for discussion before the vote, and whether the vote was conducted by secret ballot. *Ridgewell's,* 334 N.L.R.B. at 42.

The evidence establishes that the League conducted a general membership meeting and vote on September 11, 2005, to determine whether to affiliate with the International Association of Machinists and Aerospace Workers ("IAM"). Doc. 2, Mem. in Supp., 2. Approximately ten days before the September 11 meeting and vote, League leaders distributed flyers to the employees at Respondent's facility concerning the proposed affiliation and the meeting. The flyers included translations into Punjabi and Spanish. At the same time, the League mailed employees postcards concerning the September 11 affiliation meeting. At the meeting, information regarding the proposed affiliation was provided in two sessions. One session was conducted in English and Punjabi, and the other in Spanish and Portuguese. League leaders explained the details of the proposed affiliation and gave employees the opportunity to discuss and ask questions about the proposed affiliation. Many

questions were asked about the dues structure and benefits and pensions. All unit employees were entitled to vote on the affiliation. The vote used voting booths, secret ballots, election monitors, and a sealed ballot box. The result was 918 for affiliation, 21 against, with 4 void ballots, for a total of 943 voters. Aff. & Ex. in Supp. of Pet. [hereinafter, Aff. & Ex.], 3, 15, 16, 21, 49–51, 101–108, 110–22.

Respondent argues that the court cannot find that due process was adequate on the existing record. Respondent first points out that the League has not provided attendance sheets for the discussion sessions. The League has provided affidavits that state that more than 800 employees attended the discussion sessions. Aff. and Ex., 3 ("800+"), 21 ("950"). Respondent has not challenged this evidence.

Respondent also states that Petitioner has not established exactly how many employees received advance notice. "For example, although the League claims to have purchased over 2,000 mailing labels to mail notices to employees about the affiliation vote, [Petitioner] supplied no evidence to corroborate that these were actually mailed to employees, or to show how many employees actually received notices. Likewise, [Petitioner] fails to provide any evidence showing how many employees actually received the handbills it claims were distributed on or about August 29 and September 1, 2005." Doc. 32, Mem. in Opp., 19 n. 10.

Petitioner has provided evidence that handbilling regarding the September 11 meeting was conducted at the plant gate on both August 29 and September 1, 2005, before and after shift changes. Aff. & Ex., 3, 21. The flyers were printed in English and Spanish, and handwritten in Punjabi. Ralph Meraz, the League's "lead", states that "[t]he Union also mailed a card to the membership's homes." Aff. & Ex., 22.

The card announces "Our Next Meeting," states the venue, "Livingston Portuguese Hall," and gives the date and times of the information sessions, all in both English and Spanish. Aff. & Ex., 30 (Ex. 2 to 10/13/05 Aff. of Ralph Meraz).

At oral argument before the court on March 22, 2006, Respondent questioned due process on the grounds that less than half the unit employees voted in the affiliation election. Respondent does not present evidence that any unit employee was prevented from voting or was denied notice of the meeting. In *Minn–Dak Farmers Cooperative*, 311 N.L.R.B. 942 (1993), the Board held that the due-process requirements were met by providing the entire unit with an opportunity to vote. In doing so, the Board rejected the employer's arguments that the entire membership of the union must be permitted to vote and that a majority of those eligible to vote rather than those voting is necessary. *Minn–Dak*, 311 N.L.R.B. at 945–47; *see also*, National Labor Relations Board, *An Outline of Law and Procedure in Representation Cases*, § 11–100 (July 2005).

> In affiliation cases . . . the Board faces the difficult task of reconciling the two partly inconsistent goals of guaranteeing employees their free choice of bargaining representative and fostering stable collective bargaining relationships. . . . [T]he Board requires, consistent with the policy of free choice, that the election procedure be conducted in accordance with minimal standards of "due process," so that the outcome accurately reflects the employees' true desires.

Note, *Union Affiliations and Collective Bargaining*, 128 U. Pa. L.Rev. 430, 433 (1979).

As in *CPS*, there is no evidence that the voters were not adequately apprised of the issues before them, that anyone objected to the voting procedures, or that the result did not accurately reflect the votes cast or the true sentiments of the members. *CPS*, 324 N.L.R.B. at 1019. Respondent has failed to show that the affiliation vote was conducted in derogation of the employees' due-process rights, nor has Respondent provided legal authority that less than one half of all eligible workers cannot lawfully approve an affiliation. If a majority vote of all employees is required to approve an affiliation, it is Respondent's burden to provide such legal authority. *Minn–Dak* is to the contrary.

b. Continuity

> Corresponding to the concern with stability [of the collective bargaining relationship] is a test for "continuity of representation," by which the Board seeks to determine whether replacement by the successor union disrupts the bargaining relationship established by its predecessor.

Note, 128 U. Pa. L.Rev. at 433.

■ To prevail, Respondent must demonstrate that the affiliation resulted in changes that are sufficiently dramatic to alter the identity of the League, and thus in the substitution of an entirely different union as the employees' representative. *CPS*, 324 N.L.R.B. at 1020 (*citing Western Commercial Transport*, 288 N.L.R.B. 214, 217–18 (1988)). The Board reviews such claims under a "totality of the circumstances" standard and takes into consideration several factors, including: continued leadership responsibility by existing union officials; continuation of the manner in which contracts are negotiated; perpetuation of membership rights and duties; eligibility for membership; qualifications to hold office; oversight of executive council activity; the dues/fees structure; authority to change provisions in its governing documents; frequency of membership meetings; and preservation of the prior union's physical facilities, books, and assets. *Mike*

*Basil Chevrolet,* 331 N.L.R.B. 1044, 1045–46.

Most affiliations or mergers change a union's organizational structure to some extent, but the natural and foreseeable consequences of such a combination does not automatically raise a question concerning representation. As the Supreme Court in *N.L.R.B. v. Food & Commercial Workers Local 1182 (Seattle–First National Bank),* 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986), recognized, change is the natural consequence of ordinary, valid reasons for union affiliations and mergers, such as increased financial support and bargaining power. *Seattle–First,* 475 U.S. at 199 n. 5, 106 S.Ct. 1007. "The notion that an organization somehow loses its identity and becomes transformed ... because it acquires more clout and becomes better able to do its job is an absurdity and flies in the face of a clearly stated congressional objective." *CPS,* 324 N.L.R.B. at 1020–21 (citing *Insulfab Plastics, Inc. v. Intern. Union of Electronic, Electrical, Technical, Salaried and Machine Workers,* 274 N.L.R.B. 817, 823, 1985 WL 45830 (1985)).

■ Petitioner's evidence shows that the League retained all of its officers, all of whom perform the same duties they previously performed. Aff. & Ex., 4; *see CPS,* 324 N.L.R.B. at 1022 ("[t]his retention of the [union's] president as CPS group leader establishes substantial continuity of leadership"). The League will also continue to choose its own officers, shop stewards, negotiating committee members, and executive committee members. Aff. & Ex., 5. Meraz continues as lead negotiator, Aff. & Ex. 26 ("[m]y duties after the affiliation have not changed at all; my responsibility as a decision-maker is still the same"), together with an IAM official as co-lead negotiator. *Id.* "The League, its officers, and members will continue to determine how it wants to proceed in negoti-

ations and its positions on issues that are up for negotiation." *Id.*

> There is no evidence that [the larger union's co-lead negotiator] will serve as more than a valued source of expertise in negotiations and arbitrations, and certainly none that he will act inconsistently with the CPS employees' desires in either context. It is precisely to gain the benefit of such expertise that independent unions often affiliate with stronger internationals[.]

*CPS,* 324 N.L.R.B. at 1023; Aff. & Ex., 23 ("[Meraz] explained that [IAM] would assist [the League] in legal areas because they have more experience in negotiation"). This means the League bargainers are the same and the history of collective bargaining with the employer remains intact.

Under the Affiliation Agreement, all current dues-paying members of the League will be entitled to all rights and privileges of IAM membership and will have their years of good-standing membership in the League recognized and credited by the IAM in accordance with the IAM constitution. Aff. & Ex., 7.

The League has retained control over its property after the affiliation, Aff. & Ex., 5, and has acquired a new office with computer and phone systems to replace the trailer that served as the League's old office, Aff. & Ex., 46–47.

Respondent argues that Petitioner cannot on this record show that the League and IAM are "sufficiently alike" to permit their affiliation. Doc. 32, Mem. in Opp., 12. However, it is Respondent's evidentiary burden to show the converse. Respondent characterizes the changes which the League will ultimately be required to undergo as "sweeping." Id., 16. Specifically, Respondent alleges, citing the IAM constitution, that the League must: (1) Forbid Meraz and any other representa-

tive of the League from serving as an officer within the IAM until he or she has attained at least one year of tenure; (2) forbid Meraz and any other representative of the League from serving as an officer of a local lodge until he or she has attained at least one year of tenure; (3) require each member to pay monthly dues of at least two times the weighted average hourly earnings; (4) require each member to pay a monthly per capita tax to the Grand Lodge "equal to the weighted average on a union-wide basis of one hour's earnings of each Local Lodge member"; (5) obtain the approval of the Executive Committee or the International President of the IAM before declaring a strike; (6) resume work and relinquish strike benefits if the Executive Committee of the IAM orders the League's members to do so, regardless of the members' desire to continue striking; (7) obtain the approval of the International President before making any changes to the League's bylaws. Doc. 32, Mem. in Opp., 16–17.

The focus of the continuity inquiry is whether after the affiliation the Respondent faces an entity entirely different from before affiliation. The first and second factors advanced by Respondent indicate that the League has not been subsumed into IAM. *See CPS*, 324 N.L.R.B. at 1020. The size difference between IAM and the League does not per se indicate discontinuity. *CPS* points out that the Board "has consistently rejected such reasoning; so have most courts." *CPS*, 324 N.L.R.B. at 1021 & n. 21 (citations). The third and fourth factors do not indicate discontinuity, because in *CPS*, the respondent also emphasized the post-affiliation dues increases and per-capita tax. These facts did not indicate discontinuity:

Local 8–397 intends to phase in the dues increase gradually over a five-year peri-

od. Thus, the full effect of the increase will not be felt all at once.

*CPS*, 324 N.L.R.B. at 1023.

Here, the increase from five dollars per month to $20.26 (subject to increase) will be phased in over ten years. Aff. & Ex., 5. This will have much lesser impact.

Moreover, the greater financial commitment asked of OCAW members undoubtedly reflects to some extent the fact that a large international union can provide more extensive services than a small independent like the Association. It is unlikely that the employees would expect to get stronger representation from OCAW absolutely free.

Id. IAM has waived the per-capita tax. Aff. & Ex., 5, 10.

Though IAM has the authority to veto a strike or order the League to return to work, Respondent has not provided any evidence of how often, if ever, IAM actually exercises these powers. It is actual practice rather than theoretical policy which is controlling. *CPS*, 324 N.L.R.B. at 1023 & n. 34.

Finally, the fact that authority to approve changes in the League's governing documents has shifted to IAM weighs against continuity. *Mike Basil Chevrolet*, 331 N.L.R.B. at 1046.

Respondent relies heavily on the Board's decisions in *Western Commercial Transport*, 288 N.L.R.B. 214 (1988), and *Garlock Equipment Company*, 288 N.L.R.B. 247 (1988), in contending that continuity of representation has been lost. Doc. 32, Mem. in Opp., 13–15.

In *Western Commercial Transport*, the smaller union's officers were unable to continue to have any major role in representing their fellow members; they were to be replaced by employees of the larger district lodge who had no prior connection to the unit. *Western Commercial Trans-*

*port,* 288 N.L.R.B. at 216. Here, Petitioner's evidence shows that the League retained all of its officers, all of whom perform the same duties they previously performed, and the lead negotiator is identical. Aff. & Ex., 4.

In *Garlock Equipment,* the Board found that the larger district lodge had veto power over the smaller union's formerly exclusive authority to contract with the company. *Garlock Equipment,* 288 N.L.R.B. at 248. Here, the League will continue to choose its own officers, shop stewards, negotiating committee members, and executive committee members. Aff. & Ex., 5. Meraz continues as lead negotiator, Aff. & Ex., 4, 26. "The League, its officers, and members will continue to determine how it wants to proceed in negotiations and its positions on issues that are up for negotiation." Aff. & Ex., 4 (James Beno, IAM Directing Business Representative); *compare Garlock Equipment,* 288 N.L.R.B. at 248 (ALJ properly did not credit Woltz's testimony regarding post-affiliation negotiation arrangements because Woltz had never been a business representative).

Respondent's evidence does not show that the League post-affiliation is an "an entirely different union." *CPS,* 324 N.L.R.B. at 1020 (*citing Western Commercial Transport,* 288 N.L.R.B. 214, 217–18 (1988)). The League's leadership will continue in their roles, Aff. & Ex., 4, 5, 26; members of the League are entitled to all benefits of IAM membership, Aff. & Ex., 7; contracts will continue to be negotiated by Meraz and other League leaders, Aff. & Ex., 26; and the League has kept its property after the affiliation, Aff. & Ex., 5. See Modjeska & Modjeska, *Federal Labor Law: NLRB Practice* [hereinafter, Modjeska & Modjeska] § 9:11 & n. 46. Since Respondent has also failed to show lack of due process, Petitioner has demonstrated a likelihood of success on the merits based on the continuity of the League's function-ing pre- and post-affiliation. *See Overstreet v. United Brotherhood of Carpenters and Joiners of America, Local Union No. 1506,* 409 F.3d 1199, 1207 (9th Cir.2005) (deference to Board's interpretation of labor statute allows a finding of likelihood of success on merely "some evidence to support the unfair-labor-practice charge together with an arguable legal theory") (*citing Miller,* 19 F.3d at 460).

2.   Irreparable Harm

The court must take into account the probability that declining to issue the injunction will permit the allegedly unfair labor practice to go unredressed and thereby render meaningless the Board's remedial authority, leaving the employees of Respondent without representation. *Miller,* 19 F.3d at 460. If the Board demonstrates that it is likely to prevail on the merits, the court presumes irreparable injury. *See Miller,* 19 F.3d at 459 (passage of statute an implied finding by Congress that violations harm public). If the charge is disputed, or if the Board has only a fair chance of succeeding on the merits, the court must consider the possibility of irreparable injury. *Miller,* 19 F.3d at 460.

Here, Petitioner has demonstrated a likelihood of success. Even if such likelihood were not present, Petitioner's evidence shows a possibility of irreparable harm.

Federico Avila, a League coordinator, states:

The Employer's refusal to recognize and bargain with the Union is really causing a lot of problems for employees and hurting the Union's relationship with employees. For example, we haven't been able to get a contract and the Union can't help defend employees if they get into trouble at work or are fired. . . . Because of this, . . . [m]any employees have told me that they are

scared to show their support for the Union and don't want to attend Union meetings because the Employer might find out that they support the Union. [A]ttendance at Union meetings has dropped somewhat since the Employer stopped recognizing the Union.

Aff. & Ex. 239–40.

Ralph Meraz states:

The Union is not able to represent employees if they have complaints or disciplinary problems with the Employer.... It is hard to estimate how much attendance has dropped because it has fluctuated, however it is down from its peak when more than 1000 people attended the meetings, which was in the Summer and Fall of 2005 prior to the Employer's withdrawal of recognition from the Union.

Aff. & Ex. 47–48.

The courts have long recognized that harm of this kind, withdrawal of recognition inflicted on a union, is often irreparable. In *Franks Bros. Co. v. N.L.R.B.*, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), the Supreme Court stated,

Out of its wide experience, the Board many times has expressed the view that the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions.

*Franks Bros. Co.*, 321 U.S. at 704, 64 S.Ct. 817.

In *Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates*, 241 F.3d 652 (9th Cir.2001), the Board argued that,

absent an interim bargaining order, support for the Union will continue to wane. When the Board finally does grant relief, the union may find that it represents only a small fraction of the employees. With only limited support, moreover, the Union will be unable to bargain effectively regardless of the ultimate relief granted by the Board.

*Stephen Dunn & Associates*, 241 F.3d at 667. The court stated that it must consider seriously the possibility that the union could not recover. *Stephen Dunn & Associates*, 241 F.3d at 668. *See also Asseo v. Centro Medico Del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir.1990).

Petitioner presents evidence that Respondent is using the situation to further depress union support:

The Employer has told employees that they do not have a Union and they are not represented by a Union. I have heard this from more than 20 employees who reported that they were told this by Human Resources personnel and their supervisors.

Aff. & Ex. 47 (Ralph Meraz).

The Employer has told employees that we don't have a union and that we don't have to pay dues.... Supervisors are also telling employees that since we don't have a Union, the Company can do whatever it wants.

Aff. & Ex., 239 (Federico Avila).

Petitioner's evidence also shows that a normally high employee turnover rate compounds the risk of irreparable harm to the League. In order to maintain support, the union must recruit continually, and its apparent powerlessness vis-a-vis Respondent makes this task more difficult. Doc. 2, Mem. in Supp., 35.

The courts have also recognized that new unions like the League are especially vulnerable to an employer's unfair labor practices. *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir.1992).

Respondent does not answer Petitioner's argument regarding irreparable harm to the League. Respondent argues first that the Board's five-month delay in filing this action indicates that it does not consider the harm truly irreparable. Doc. 32, Mem.

in Opp., 20 (*citing Maydanis v. Flamingo Hilton–Laughlin,* 1994 WL 739897, *4 (D.Nev.1994); *Fuchs v. Steel–Fab, Inc.,* 356 F.Supp. 385, 388 (D.Mass.1973)); *see Kobell v. Suburban Lines, Inc.,* 731 F.2d 1076, 1091 n. 27 (3rd Cir.1984) ("the district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim injunctive relief has allowed the status quo to change through unexplained delay"). At oral argument, Petitioner's counsel explained that the suit-authorization process is lengthy and took a number of months. Delay in the federal bureaucracy is an unfortunate ramification of the operation of government. The Board unanimously authorized Petitioner to undertake this action, Doc. 2, Mem. in Supp., 2, and Petitioner's evidence demonstrates continuing harms. Petitioner took timely action to obtain authorization for this judicial proceeding. Respondent has not presented any evidence of harm that it has suffered or will suffer to support a defense of laches. *See N.L.R.B. v. P\*I\*E Nationwide, Inc.,* 894 F.2d 887, 893–94 (7th Cir.1990) (delay that causes harm is required for laches).

■ Respondent further claims that Petitioner's argument is based on speculation. Doc. 32, Mem. in Opp., 21. Respondent ignores Petitioner's evidence that the employees have no bargaining representative after withdrawal of recognition, the loss of union support, and evidence of employer efforts to chill employee union participation.

Respondent attempts to distinguish *Stephen Dunn & Associates,* stating that there was no dispute about the identity of the bargaining representative in that and other cases relied upon by Petitioner. Doc. 32, Mem. in Opp., 21. This argument assumes that where there is any doubt concerning who the bargaining representative is, preliminary injunctive relief is improper no matter how grave the possible

harm to the union and the employees. Respondent has not provided legal authority for this proposition.

Respondent argues there is no harm because Respondent voluntarily abided by its final offer proposal to increase unit employees' pay in November and December 2005, and consequently unit employees are receiving all the benefit of union representation. Doc. 32, Mem. in Opp., 22. Even if valid, this argument ignores other facets of union representation, such as grievance resolution, employee education, as to employment rights, and union-negotiation benefits. Petitioner's evidence and argument regarding the continuing harms to the union itself and the employees caused by Respondent's withdrawal of recognition are not addressed.

Respondent argues that "[t]he only party who may be irreparably harmed if an injunction issues is the nearly 1,500 unit employees who, by [Petitioner's] own count, did not approve the League's affiliation with the District Lodge and the IAM. These employees comprise approximately two-thirds of the bargaining unit." Doc. 32, Mem. in Opp., 22. Respondent does not contest that the affiliation vote manifested overwhelming support for affiliation among the 943 employees who voted, or present its own evidence that any employee was prevented from voting or opposed affiliation. If the remaining unit employees had opposed affiliation, they could have voted against it. While it is possible that the same level of support for the union would not be manifest now, Petitioner's evidence shows that this is attributable to the Respondent's withdrawal of recognition, its attempts to take advantage of the situation to further discourage union support of which Petitioner has supplied evidence, and the reality of a high employee turnover rate which further puts the union at a disadvantage in an unstable membership. Equity does not allow a wrongdoer

to profit by his wrong. Petitioner has provided evidence of tangible harm to employees in the loss of bargaining representation. Moreover, Section 10(j) orders are enforceable without regard to whether the union has lost its majority support in the interim. Modjeska & Modjeska, § 9:11 & n. 58.

Petitioner has shown more than a possibility of irreparable harm.

### 3. Balance of Hardships

In considering the balance of hardships, the court must consider the probability that declining to issue the injunction will permit the allegedly unfair labor practice to render meaningless the Board's remedial authority. *Miller*, 19 F.3d at 460. Where the Board and the Respondent each make a showing of hardship, the court must exercise its sound discretion to determine whether the balance tips in the Board's favor. *Miller*, 19 F.3d at 460–61.

Petitioner's evidence of continuing harm centers on the absence of union representation, employer discouragement of union representation, employee perceptions (fostered by the Respondent) that union activities are disfavored, and the loss of members and chilling effect on employee union participation. Respondent repeats its argument that issuing an injunction would harm the unit employees who did not participate in the election. Doc. 32, Mem. in Opp., 24. This concern is uncorroborated by evidence. This argument has been addressed.

Respondent argues that the court should allow the Board's processes to work, since the underlying complaint will be heard before the ALJ on March 28. Id. The Section 10(j) injunction was provided by Congress in order to preserve the status quo while the Board considers and decides the underlying N.L.R.B. complaint about whether the employer lawfully withdrew union recognition. The law provides for appeal directly to the United States Courts of Appeal, further extending the process, normally a two- or three-year period. The courts have recognized that withdrawal of union recognition and refusal to bargain create a real possibility that delay will render meaningless any relief ultimately granted:

> Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation.

H.R.Rep. No. 80–245 (1947), reprinted in Subcomm. on Labor Senate Comm. on Labor and Public Welfare, 93d. Cong., Legislative History of the Labor Management Relations Act, 1947, at 292, 433.

Here, Petitioner's evidence shows that the Respondent's employees had a certified local union that subsequently affiliated with an international union. Respondent's withdrawal of recognition of any bargaining representative; its representations to the employees that the union is powerless to help them; together with the high employee turnover rate in the poultry-processing business which forces the union to continually recruit, all tend to chill employee union participation. Petitioner has demonstrated a real danger that if Respondent continues to withhold recognition, employee support will erode to such an extent that the employees will be without any representation. At that point, any final remedy that the Board may impose would be ineffectual. *See Asseo*, 900 F.2d at 454.

Respondent claims that it "only now has access to hundreds of pages of documents and other evidence that [Petitioner], the League, and IAM have had all along, and which [Respondent's] counsel requested from [Petitioner] months ago." Doc. 32, Mem. in Opp., 24. The only evidence offered is the declaration of Michael J. Hogan, Esq., which states in relevant part:

> I have had several discussions with Amy Berbower, [Petitioner's] attorney assigned to investigate the League's charge, concerning the League's allegations and [Respondent's] position with respect to its bargaining obligations. In or around October 2005, I asked Ms. Berbower to supply me with a copy of the purported affiliation agreement ("Agreement") between the League and the District Lodge and/or the IAM. Ms. Berbower refused to provide me with a copy of the Agreement.

Decl. of Michael J. Hogan, ¶ 5. The Affiliation Agreement is eight pages long. Aff. & Ex., 7–14. The citation does not support Respondent's assertion.

At oral argument, Respondent alleged that Petitioner had "stonewalled" requests for documents, including the IAM constitution and bylaws. Counsel for Petitioner represented that she told counsel for Respondent that these documents were available on the Department of Labor website. The IAM does not, in fact, allow its constitution or bylaws to be posted on any public website, including that of the Department of Labor. Petitioner's counsel stated that discovery was not available in actions before the NLRB, and she could not give Respondent a copy of the IAM's constitution and bylaws. Respondent does not argue that this information will not be available in the Board hearing of the complaint.

The balance of hardships can be stated succinctly. The original local union affili-

ated with an international. The structure of the affiliated union vis-a-vis the employer bargaining and employee representation has not materially changed. The employer's refusal in response to recognize the League or to bargain, leaving the employees without representation and abrogating the bargaining unit, is a significant hardship that greatly outweighs that of Respondent having to recognize and negotiate with the affiliated League, pending administrative determination of the N.L.R.B.'s complaint. Respondent suffers no other hardship, and is not qualified to speak for "other non-voting employees." The balance of hardships strongly favors Petitioner.

The balance of hardships favors issuing an injunction.

### 4. The Public Interest

The public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge. *Miller*, 19 F.3d at 460. Petitioner's evidence supports its contention that without a Section 10(j) injunction the union may not be able to benefit from any relief ultimately granted by the Board. Respondent repeats its argument that the unit employees are not suffering harm in the absence of an injunction because Respondent has granted them wage increases pursuant to its final contract offer. Doc. 32, Mem. in Opp., 25–26. Even if true, this argument does not address the continuing harm to the League itself or the absence of representation on workplace and other issues a union provides employees.

Respondent offers "protecting employers from the imposition of sanctions based on unfounded unfair-labor-practice charges" as a countervailing public interest. Id., 26. In determining whether to issue an injunction, the court considers the merits only to the extent of probability of

final success. Petitioner has demonstrated a probability of success on the merits. *See Miller*, 19 F.3d at 460 ("Board can make threshold showing of likelihood of success by producing *some* evidence to support the unfair labor practice charge, together with an *arguable* legal theory") (emphasis added).

Respondent argues that "a bargaining representative" should not be "imposed by judicial fiat on a group of over 2,400 employees." Doc. 32, Mem. in Opp., 26. The injunctive relief requested is not "judicial fiat," but rather is specifically authorized by Congress under Section 10(j). Respondent ignores Petitioner's evidence that the status quo was union representation, voting on the issue of affiliation was open to all unit employees, and support among those voting was overwhelming for affiliation. Respondent's statement that "most of the employees did not vote in favor of" the affiliation, while technically accurate, is misleading because "most" employees did not vote at all. The First Circuit rejected a similar argument in *Asseo:*

> [T]he danger that the Union would lose support because of unfair labor practices committed by the employer, leading to irreparable injury to the employees and to the bargaining unit, clearly outweighs any harm which granting injunctive relief would inflict on the defendant. Indeed, the only argument which Turabo seriously advanced at the district-court level was that "granting the interim bargaining order will be tantamount to imposing an unwanted Union on the employees, which will create labor unrest and adversely affect the Employer's prospects of obtaining necessary financing to continue its operations." We, like the district court, fail to find merit in this contention.

*Asseo*, 900 F.2d at 454–55.

Respondent points to the apparent decline in voter turnout between the elections held in November 2004 and those for affiliation in September 2005, which it characterizes as "ad hoc." *Id.* This suggests that Respondent infers diminished employee interest in union representation because fewer employees voted. However, there is no issue here of an injunction "nullify[ing] majority choice." Respondent's claims of what employees "want" are unsupported speculation as it has submitted no evidence of employee preference. *See Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138, 143 (3d Cir.1975).

Based on the reduction in overall employee voter turnout, Respondent argues that the court should not "rush to judgment and force [Respondent] to bargain with an organization that has not yet demonstrated that it is the legitimate bargaining representative of the appropriate bargaining unit." Doc. 32, Mem. in Opp., 26. Petitioner's unrebutted evidence that Respondent is taking advantage of present circumstances to eliminate union representation, discourage employee participation in a union, and hinder the union's recruitment effort greatly weakens this argument. A stay of proceedings would perpetuate the alleged unfair labor practices, not alleviate the continuing harms which Petitioner's evidence establishes.

Respondent claims that because an injunction would "merely require [Respondent] to meet and bargain in good faith with" the League, the relief would in fact have little impact. Id., 26–27. However, Respondent's union-suppression efforts, according to evidence supplied by Petitioner and not rebutted by Respondent, gain their leverage from Respondent's position that no union represents its employees. Requiring Respondent to recognize the League pending the N.L.R.B. decision and to cease its anti-union conduct will most fairly maintain the status quo to serve the N.L.R.A. purposes of not damaging union representation or the bargaining unit.

Respondent's unpersuasive delay argument has already been addressed above.

5. Bond

Because Petitioner represents an agency of the United States, no bond is required. *See* Rule 65(c), Fed.R.Civ.P.; *Squaxin Island Tribe v. State of Washington*, 781 F.2d 715, 723 (9th Cir.1986).

## VI. CONCLUSION

For all the foregoing reasons, having fully considered the evidence, probable success on the merits, irreparable harm, balance of hardships, and the public interest, the petition for Section 10(j) injunction is GRANTED. Petitioner shall submit a proposed form of injunction consistent with the law and this decision. Petitioner shall file that order with the court within two (2) days following electronic service of this decision.

**SO ORDERED.**